**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL DONALD GINYARD, JR.,<br><br>Defendant. | Criminal Action No. 20-155 (CKK) |

**MEMORANDUM OPINION**
(May 2, 2022)

Defendant Michael Donald Ginyard, Jr. is charged by Indictment with unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g).   This charge arises from the recovery of a pistol and ammunition during the execution of a search warrant at Defendant Ginyard's residence on May 30, 2020.   The search warrant was obtained by Humane Law Enforcement Officer ("HLEO") Ian Matheson of the Washington Humane Society ("WHS"), based upon his affidavit detailing three complaints that Defendant Ginyard had mistreated his dog, in violation of D.C. Code § 22–1001, *et seq*.

Defendant Ginyard has filed a [54] Motion to Suppress Tangible Evidence obtained as a result of the search warrant and a [55] Motion to Suppress Statements made to law enforcement officers during the execution of the search warrant.   In his Motion to Suppress Tangible Evidence, Defendant Ginyard challenges the validity of HLEO Matheson's affidavit and the resulting search warrant, and requests (among other relief) a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).   This Memorandum Opinion addresses only whether Defendant Ginyard is entitled to a *Franks* hearing, but not the remainder of Defendant's Motion to Suppress Tangible Evidence, or his Motion to Suppress Statements.

Upon careful consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court concludes that Defendant Ginyard has failed to demonstrate that the affidavit in support of the search warrant contained false statements or omitted facts material to the probable cause determination, or that any such statements or omissions were made knowingly and intentionally with reckless disregard for the truth.   Accordingly, the Court shall **DENY** Defendant Ginyard's request for a *Franks* hearing.

## I.   BACKGROUND

To provide context for the facts pertinent to Defendant Ginyard's request for a *Franks* hearing, the Court shall first briefly describe the procedural history of this case, focusing on the pending motions to suppress evidence and statements.   After doing so, the Court shall present the facts underlying WHS's investigation of complaints regarding Defendant Ginyard's alleged abuse of his dog, the execution of the search warrant, and recent developments regarding HLEO Matheson's termination from the WHS.

---

[1] The Court's consideration has focused on the following pleadings and accompanying exhibits:

- Defendant's Motion to Suppress Tangible Evidence and Statements ("Def.'s Mot. to Suppress Evid."), ECF No. 54;
- Defendant's Motion to Suppress Statements ("Def.'s Mot. to Suppress Stmts."), ECF No. 55;
- United States' Opposition to Defendant's Motions to Suppress ("Gov.'s Opp'n"), ECF No. 57;
- Reply to Government's Opposition to Defendant's Motions to Suppress ("Def.'s Reply"), ECF No. 59;
- Supplemental Memorandum of Facts and Law in Support of Motions to Suppress Tangible Evidence and Statements ("Def.'s Suppl. Mem."), ECF No. 68;
- United States' Supplemental Opposition to Defendant's Motions to Suppress ("Gov.'s Suppl. Opp'n"), ECF No. 75;
- Defendant's Reply to Government's Supplemental Opposition to Defendant's Suppression Motions ("Def.'s Suppl. Reply"), ECF No. 91-1; and
- United States' Reply in Opposition to Defendant's Reply (and Previous Motions to Suppress) ("Gov.'s Suppl. Reply"), ECF No. 96.

**A. Procedural Posture**

On May 29, 2020, Judge Steven Wellner of the Superior Court of the District of Columbia ("Superior Court") authorized a search warrant (the "Search Warrant") permitting law enforcement officers to search Defendant Ginyard's residence and the "surrounding yard and property."   Def.'s Mot. to Suppress Evid. Ex. 1, Search Warrant, ECF No. 54-1.   In so doing, Judge Wellner relied on an affidavit submitted by HLEO Matheson (the "Affidavit"), which detailed three complaints received by WHS between February and May 2020, alleging that Defendant Ginyard had failed to provide adequate shelter for, improperly tethered, and otherwise abused his dog.[2]   *See* Def.'s Mot. to Suppress Evid. Ex. 2, Affidavit, ECF No. 54-2.   Judge Wellner concluded that there was probable cause to search Defendant Ginyard's apartment and the "surrounding yard and property" for "[p]roperty which constitutes the commission of a crime in violation of [D.C. Code § 22–1001]," specifically "[a]nimals abused or neglected (dead or alive, born or unborn, above ground or below), documents that provide proof of ownership or a history of veterinary care, and any other evidence of animal cruelty/neglect."[3]   Search Warrant.

On May 30, 2020, officers of the Metropolitan Police Department ("MPD") assisted WHS in executing the Search Warrant.[4]   Compl., Stmt. of Facts, ECF No. 1-1.   During the search, an MPD officer recovered from a box inside a bedroom closet a .40 caliber semiautomatic handgun, loaded with one round of ammunition in the chamber and eleven rounds of ammunition

---

[2] These three complaints are discussed in greater detail *infra* Section I(B).

[3] Pursuant to D.C. Code § 22–1005, when a "complaint is made by any humane officer of the Washington Humane Society on oath or affirmation, to any magistrate authorized to issue warrants in criminal cases, that the complainant believes, and has reasonable cause to believe, that the laws in relation to cruelty to animals . . . being violated in any particular building or place," the magistrate, "if satisfied that there is reasonable cause for such belief, shall issue a search warrant, authorizing any marshal, deputy marshal, police officer, or any humane officer of the Washington Humane Society to search such building or place."   D.C. Code § 22–1005.

[4] Because this Memorandum Opinion focuses only on Defendant Ginyard's request for a *Franks* hearing, the Court shall reserve for a later date a more detailed presentation of the facts regarding the execution of the Search Warrant.

in a fourteen-round capacity magazine.  *Id.*   A criminal history check showed that Defendant Ginyard had a prior felony conviction in Superior Court for carrying a pistol without a license, for which he was sentenced to twenty (20) months.   *Id.*

Defendant Ginyard was charged by Indictment in this case with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).   *See* Indictment, ECF No. 16.

On April 16, 2021, Defendant Ginyard filed his pending Motion to Suppress Tangible Evidence and Motion to Suppress Statements.   In the former, Defendant Ginyard challenges the validity of the Affidavit, argues that the Search Warrant was overbroad and unsupported by probable cause, and contends that the execution of the search was unreasonable.   *See generally* Def.'s Mot. to Suppr. Evid.   Based on these alleged Fourth Amendment violations, Defendant Ginyard contends that the "good-faith exception" to the exclusionary rule does not apply, and that the firearm obtained during the search should be suppressed.   *See id.* at 20–22.   In his Motion to Suppress Statements, Defendant Ginyard argues that statements he made to law enforcement officers during the execution of the Search Warrant should be suppressed because he was not advised of his *Miranda* rights when he was handcuffed in his living room while the search warrant was executed.   *See generally* Def.'s Mot. to Suppr. Stmts.

This Memorandum Opinion focuses on Defendant Ginyard's challenges to the Affidavit and his request for a *Franks* hearing.   *See* Def.'s Mot. to Suppr. Evid. at 21–22; Def.'s Reply at 18–22.   As to that specific request, Defendant Ginyard argued in his initial Motion to Suppress Tangible Evidence that HLEO Matheson omitted material information about the "biases" and "reliability" of two of the individuals who complained to WHS about Defendant Ginyard's alleged

mistreatment of his dog.   *See* Def.'s Mot. to Suppr. Evid. at 21.   He claimed that he "is entitled to a *Franks* hearing to establish" that these omissions "were material and were made . . . knowingly or with reckless disregard for the truth."   *Id.*

The Government filed an opposition to Defendant's suppression motions on May 7, 2021, *see* Gov.'s Opp'n, and Defendant Ginyard filed his reply on May 21, 2021, *see* Def.'s Reply. Defendant Ginyard renewed his request for a *Franks* hearing in his Reply, contending that he was "entitled to a *Franks* hearing to determine whether the affiant acted with reckless disregard for the truth" by omitting information about the complaining witnesses.   Def.'s Reply at 20. Simultaneously with his Reply, Defendant filed a [60] Motion to Compel Disclosure of Information Relating to the Complaints Leading to the Search Warrant, in which he sought to compel the Government to disclose WHS case files regarding two complaints of Defendant Ginyard's alleged mistreatment of his dog.[5]   *See* Def.'s Reply at 21; Def.'s Mot. to Compel, ECF No. 60.   The Government produced the requested materials to Defense counsel on May 24, 2021. *See* Gov.'s Resp. to Mot. to Compel, ECF No. 64; Notice, ECF No. 62.   During a status hearing on May 26, 2021, Defendant Ginyard requested leave to file supplemental briefing on his pending suppression motions to allow him to address the WHS records produced by the Government and to request additional materials if necessary.   *See* Minute Order (May 26, 2021).   The Court granted Defendant Ginyard's request and set a supplemental briefing schedule.   *Id.*

Defendant Ginyard filed his supplemental brief on June 18, 2021.   Def.'s Suppl. Mem., ECF No. 68.   He again renewed his request for a *Franks* hearing, presenting several new arguments—addressed *infra* Section III—regarding purported "material omissions" and "false

---

[5] Specifically, Defendant Ginyard requested case files pertaining to the complaints received by the WHS on or about February 16, 2020, *see infra* Section I(B)(1), and on or about April 24, 2020, *see infra* Section I(B)(2). These Case View Reports were submitted to the Court as exhibits to Defendant Ginyard's Supplemental Memorandum, ECF No. 68.

statements" contained in the Affidavit based on his review of the WHS records.  *See id.* at 4–11.
The Government then filed a supplemental opposition on July 9, 2021.  *See* Gov.'s Suppl. Opp'n,
ECF No. 75.  In addition to opposing Defendant Ginyard's request for a *Franks* hearing, the
Government's Supplemental Opposition informed the Court and Defendant Ginyard:



*Id.* at 5.  The Government indicated that this development did not "alter" its position that a *Franks*
hearing in this case is not warranted.  *Id.* at 5–6.  It further noted that it was "working to obtain
more details about the incident" and would "make further disclosures, if appropriate, as soon as
possible."  *Id.* at 5.

Thereafter, Defendant Ginyard requested that the Court vacate the deadline previously set
for his supplemental reply (July 16, 2021) to allow the parties additional time to obtain information
████████████████████████████████████████.  *See* Def.'s Mot. to Vacate, ECF No.
76.   The Court granted Defendant Ginyard's request, and vacated the deadline for his
supplemental reply and its scheduled evidentiary hearing on Defendant Ginyard's suppression
motions.  *See* Minute Order (July 14, 2021).

The Court then held a status hearing on July 27, 2021, during which the Court discussed
with the parties the status of the investigation ████████████████████.  Minute
Order (July 27, 2021).   The Government's counsel indicated that he was in the process of
obtaining relevant records from WHS through its outside counsel and that he would engage with
Defense counsel to discuss an appropriate protective order pertaining to those materials.  *Id.*  The

parties requested that the Court schedule an additional status hearing, which the Court set for August 16, 2021.  *Id.*

During the August 16, 2021 status hearing, the parties again discussed the status of the investigation and agreed to a revised deadline for Defendant Ginyard to file a supplemental reply in support of his motions to suppress.  *See* Minute Order (Aug. 16, 2021).  That deadline was subsequently extended upon Defendant Ginyard's request to allow him time to obtain additional information from the Government ███████████████████████████.  *See* Def.'s Mot. for Extension, ECF No. 85; Minute Order (Sept. 22, 2021).  Defendant Ginyard filed his supplemental reply on October 13, 2021.  *See* Def.'s Suppl. Reply, ECF No. 91.

In advance of a re-scheduled evidentiary hearing set for October 27, 2021, the Government filed an Unopposed Motion to Convert the Evidentiary Hearing to a Status Hearing, indicating that the Government intended to file an additional supplemental brief, addressing the arguments raised in Defendant Ginyard's supplemental reply.  *See* Gov.'s Mot. to Convert Hr'g, ECF No. 93.  The Court vacated the evidentiary hearing, and ordered the Government to file its supplemental brief by November 19, 2021.  *See* Minute Order (Oct. 20, 2021).  The Court also noted, upon the parties' request, that it would "first address the issue of whether a *Franks* hearing is required in this case before setting a date for any future status and/or evidentiary hearing, if appropriate."  *Id.* The Government filed its final supplemental reply on November 19, 2021.  *See* Gov.'s Suppl. Reply.

**B.  WHS Investigation of Complaints Regarding Defendant Ginyard's Alleged Mistreatment of His Dog**

Turning to the factual background underlying Defendant Ginyard's request for a *Franks* hearing, the Court shall next discuss the three complaints received by WHS and WHS's investigation of each complaint.  In so doing, the Court shall first describe the factual allegations

presented in HLEO Matheson's Affidavit. To the extent the parties have provided additional evidence corroborating or disputing the facts contained in the Affidavit, the Court shall also present that evidence. Moreover, because Defendant Ginyard's request for a *Franks* hearing relies principally on allegations that HLEO Matheson omitted material facts from the Affidavit, the Court shall address facts provided on the present record, but not included in the Affidavit.

### 1. First Complaint (February 2020)

#### a. Affidavit

According to the Affidavit, on February 21, 2020, WHS received a complaint from an anonymous source, "Complainant 1," who reported that a dog was tied outside a residence located at 1215 Morse Street NE, Washington, D.C. in cold weather and that the dog was whining. Affidavit at 1. In response to this complaint, HLEO Matheson reported to the address and observed a "tan, male, pit bull terrier type dog tethered outside in a hazardous manner" in 34-degree weather. *Id.* The dog did not have "proper shelter," as required by D.C. law. *Id.* HLEO Matheson spoke with Defendant Ginyard, the owner of the dog, "advised him regarding [D.C.] Code pertaining to Cruelty to Animals" and provided him "with information on veterinary resources." *Id.* Defendant Ginyard identified the dog as "King." *Id.*

#### b. Other Evidence on the Record

Defendant Ginyard has submitted to the Court WHS's "Case View Report" corresponding to the First Complaint received by WHS. *See* Def.'s Suppl. Mem. Ex. 1, Case View Report for Case #C05707074 ("Complaint 1 Case View Report"), ECF No. 68-1. An entry created by HLEO Matheson indicates that on February 21, 2020, it was "34*f, breezy . . . I obs a tan PB type dog tethered hazardously, on a short lead . . . Dog was heard to be whimpering. No winterized shelter available." *Id.* at 2, Memo 5278338. HLEO Matheson noted that he informed Defendant

Ginyard that his dog could not be outside without winterized shelter when the temperature was below 40 degrees. *Id.* Defendant Ginyard reportedly did not realize that there was a law governing such conditions. *Id.* HLEO Matheson also reported that he advised Defendant Ginyard "at length regarding tethering," "served a notice in hand regarding proper shelter and tethering violations," and provided Defendant Ginyard with "vet resources." *Id.*

Defendant Ginyard does not dispute the basic facts set forth in the Affidavit and Case View Report regarding his interaction with HLEO Matheson in February 2020. He does not dispute, for example, that his dog was outside in cold weather, whimpering, without "winterized" shelter, tied on a short lead. *See* Def.'s Reply at 2. He states that he explained to HLEO Matheson that he had tied the dog outside while he was cleaning the inside areas of his home. *See* Def.'s Suppl. Mem. Ex. 3, Affidavit of Michael Donald Ginyard, Jr. ("Ginyard Aff.") ¶ 2, ECF No. 68-3.

In addition to the facts described above, WHS's Case View Report also details follow-up visits by HLEO Matheson, as well as additional complaints about King being outside in cold weather. According to the Case View Report, HLEO Matheson returned to Defendant Ginyard's property on March 4, 2020 and noted only that the outside temperature was 64 degrees and there was "[n]o sign of tether." Complaint 1 Case View Report at 2, Memo 5290853. Then, on March 9, 2020, WHS received an additional complaint by an "[a]nonymous caller" who "report[ed] a dog . . . outside in the cold with no known shelter." *Id.* at 2, Memo 5293782. An entry on the same date indicates that "temp. was over 50 degrees. Elected not to go out immediately and referred to HLEO Moyer for follow up[.]" *Id.* at 2, Memo 5294613. Later that day, HLEO Timothy Moyer visited Defendant Ginyard's property and observed King "lying prone in a black wire crate on porch . . . The crate was open. I could not see if the animal was tethered – no tether seen. Yard appeared secure. Crate had plastic covering on top." *Id.* at 2, Memo 5294517. HLEO

Matheson again visited Defendant Ginyard's residence on March 10, March 31, and April 2, 2020. *Id.* at 2–3, Memos 5300095, 5313569, 5315133.   In each of the associated Case View Report entries, HLEO Matheson indicates only that the outdoor temperature was more than 40 degrees, and that he observed that King was not tethered and had available a "black wire crate" with blanket on top.   *Id.*   An additional entry dated April 2, 2020 indicates that the case would be closed "due to compliance met."   *Id.* at 3, Memo 5315136.

Although the Affidavit does not provide specific details regarding these follow-up visits, the additional anonymous call, or Defendant Ginyard's "compliance" in addressing the temperature and tethering violations observed by HLEO Matheson in February 2020, it does indicate that HLEO Matheson had "been to the property no less than five times[6] and on some occasions has observed . . . [King] in a cage on the porch and on other occasions . . . [King] free roaming in the yard on the property."   Affidavit at 3.

### 2. Second Complaint (April 2020)

#### a. Affidavit

The Affidavit next describes a second complaint received by WHS on April 24, 2020: an anonymous complainant ("Complainant 2") relayed that an unidentified witness ("Witness 1") had "observed [King] being thrown down stairs, burned with hot water, and hurt on a daily basis" and knew that "[King] was injured and did not receive veterinary care."   Affidavit at 2.   The Affidavit indicates that HLEO Moyer directly contacted Witness 1, who "stated to him that approximately one month ago [Witness 1] observed [Defendant Ginyard] throw [King] down a flight of stairs[.]"   *Id.*   Witness 1 also reported seeing Defendant Ginyard "throw hot water" on King, which

---

[6] As described here, Officer Matheson first observed King in February 2020, and then made subsequent visits to Defendant Ginyard's property on March 4, March 10, March 31, and April 2, 2020.   *See* Complaint 1 Case View Report at 2–3.

"resulted in a spot of missing fur on [King's]'s side." *Id.*   Witness 1 further stated that Defendant

Ginyard had thrown the dog against a wall inside his house, leaving a hole in the wall.   *Id.*

   According to the Affidavit, HLEO Moyer (*not* the affiant, HLEO Matheson) went to

Defendant Ginyard's residence to investigate this complaint.   *Id.*   He observed King walking

with an "uneven gait" and had "spots of missing fur and darkened skin on [his] tail." *Id.*   The

Affidavit notes that HLEO Moyer met with Defendant Ginyard, who denied allegations of abuse.

Defendant Ginyard explained that King had been limping for approximately three weeks a few

months earlier, and that he had not taken the dog to be treated by a veterinarian.   *Id.*   Defendant

Ginyard also stated that he believed the spots of missing fur were due to shedding.   *Id.*

   b.   Other Evidence on the Record

   With its most recent supplemental brief, the Government submitted to the Court an audio

recording of the interaction between Defendant Ginyard and HLEO Moyer.   *See* Gov.'s Suppl.

Reply at 27.[7]   The summary of HLEO Moyer's interaction with Defendant Ginyard contained in

the Affidavit accurately recounts their conversation.   HLEO Moyer informed Defendant Ginyard

of the nature of the allegations received by WHS.   He first explained that somebody reported that

the dog had hurt his leg and noted that he had himself observed that King had a "weird gait" and

was "walking kind of weird."   4/24/20 Audio at 1:36–2:01.   HLEO Moyer asked Defendant

Ginyard if he had ever noticed the dog walk with a limp.   *Id.* at 2:01–2:06.   Defendant Ginyard

responded that about four months earlier, King had a limp for about three weeks.   *Id.* at

2:06–2:35.   HLEO Moyer advised Defendant Ginyard that he should talk to a veterinarian.   *Id.*

at 2:58–3:02; 3:30–3:37.   Defendant Ginyard asked HLEO Moyer if the dog look injured to him,

---

[7] The Court received a CD containing an audio recording with the filename "1215 morse 4-24-20.m4a."   The Court shall refer to this recording in citations as "4/24/20 Audio."

to which HLEO Moyer replied, "the dog looks like he has a weird kind of walk . . . I would imagine it's not broken or, if it was, it was healed—like you were saying, something could have gotten dislocated . . . that it's kind of resolved itself to some degree.   I don't know if he has an ongoing thing.   He doesn't look to me like he's in pain.   Dogs are good at showing—at not showing, you know, that they're in pain."   *Id.* at 3:38–4:01.

HLEO Moyer then explained that a complainant had also reported that "somebody" had thrown scalding water on the dog and that the dog was burned.  *Id.* at 4:42–4:52.  Defendant Ginyard again asked HLEO Moyer if he saw anything wrong with the dog.  *Id.* at 4:53–5:02. HLEO Moyer said that he saw there were "spots missing on his tail" that were "dark" and "missing fur."  *Id.* at 5:29–5:50.   Defendant Ginyard responded that he thought the spots were from shedding.  *Id.* at 5:38–5:59.   HLEO Moyer noted that it did not look like shedding to him.  *Id.* at 5:57–5:59.   Defendant Ginyard denied the allegation that he had burned King with hot water.  *Id.* at 6:10–6:24.

Defendant Ginyard claims that the Affidavit omits certain information regarding this conversation.   First, Defendant Ginyard indicates (in his own affidavit) that he informed HLEO Moyer that he "suspected that the person who complained was the mother of my son, because she was trying to create problems for me because of visitation and custody issues we were trying to work through."   Ginyard Aff. ¶ 3.   The audio recording does not support this assertion. Defendant Ginyard repeatedly indicated to HLEO Moyer that he did know who would have made this report to WHS, but that it must have been somebody who know him "personally" to be saying "hateful" things and providing "false information," suggesting that it *could* have been a "baby mama, anything. Who knows?"  4/24/20 Audio at 7:27–8:10.   He did not explain to HLEO

Moyer, as his affidavit suggests, any details about the allegedly contentious nature of his relationship with the person he suspected to be Witness 1.

Defendant Ginyard also attests that HLEO Moyer told him during this conversation that "the dog seemed fine," but that HLEO Matheson omitted this observation from the Affidavit. Ginyard Aff. ¶ 3.   Again, based on the audio recording from this encounter, Defendant Ginyard's recollection is not entirely accurate.   Before explaining the nature of the two complaints to Defendant Ginyard, HLEO Moyer observed that there was a crate set up for King in the yard, and confirmed that Defendant Ginyard supplied the dog with water.   4/24/20 Audio at 1:15–1:25. HLEO Moyer stated, he "looks like he's … yeah."   *Id.* 1:31–1:36.   Later in their conversation, HLEO Moyer agreed that King's leg did not look broken but, as detailed above, did note that the dog walked with a "weird" gait.   *Id.* at 1:36–2:01.

The Case View Report provides additional information about the Second Complaint.   *See* Def.'s Suppl. Mem. Ex. 2, Case View Report for Case #C05775408 ("Complaint 2 Case View Report"), ECF No. 68-2.   According to an entry by HLEO Moyer on April 24, 2020, after speaking with Defendant Ginyard, he spoke with Witness 1, who "stated that King's owner is the father of her son."   *Id.* at 2, Memo 5329516.   The witness reportedly told HLEO Moyer that she had observed Defendant Ginyard throw the dog down the stairs and that she had advised Defendant Ginyard to take the dog to be "seen" for his injury.   *Id.*   The same entry notes that the witness reported that the dog had a "spot" on his side from where Defendant Ginyard had thrown hot water on him; but it also notes that HLEO Moyer advised the witness that he had not seen a "spot."   *Id.* The witness also told HLEO Moyer that Defendant Ginyard is an "abuser" and that she "wanted a welfare check."   *Id.*   HLEO Moyer reportedly explained to her that he had met with Defendant Ginyard and observed King, but that he "needed more information from her," and asked if she

would be willing to write a statement. *Id.* The witness responded that she could not write a statement "at the moment," but "would make time later." *Id.* There is no other statement from this witness on the record.

### 3. Third Complaint (May 2020)

#### a. Affidavit

As detailed in the Affidavit, on May 27, 2020, a second unnamed witness—"Witness 2"—contacted WHS to report that she had seen someone kick a dog outside Defendant Ginyard's address. Affidavit at 2. HLEO Moyer contacted Witness 2, who provided descriptions consistent with Defendant Ginyard and King. *Id.* Witness 2 stated that she had seen Defendant Ginyard hold down the dog, yell at him, and stomp on his head with "enough force to cause pain, but not enough to crush the dog's skull." *Id.*

#### b. Other Evidence on the Record

The parties have each filed additional evidence regarding the Third Complaint—the Government has provided a witness statement from Witness 2, and Defendant Ginyard has submitted his own affidavit. The Court shall address both, as well as additional information obtained in WHS's Case View Report.

WHS received a sworn statement from Witness 2, dated May 28, 2020.[8] Witness 2 indicates that, on May 27, 2020 at approximately 7:15 pm, she saw a "black man" in the backyard of a residence located at 1215 Morse Street NE, yelling at a dog. Gov.'s Suppl. Opp'n Ex. 1, Witness 2 Stmt. at 1, ECF No. 75-1. Witness 2 indicates that she was in the alley behind the residence, about 80 feet from the building, and could see the man and the dog through a chain-link

---

[8] The Witness Statement is dated May 28, but it was "sworn on June 4." *See* Gov.'s Suppl. Opp'n Ex. 1, Witness 2 Stmt. at 1, ECF No. 75-1.

fence.  *Id.*  She observed the man "hold the dog down by the neck" and "kick[ ] the dog in the head, in a stomping motion."  *Id.*  She states that she yelled at him to stop, and he yelled back at her that she should mind her own business.  *Id.*  She responded that she would call "animal control" before walking "back down the alley and into my yard to make the call."  *Id.*

Defendant Ginyard denies abusing King, but does not dispute many of the facts presented by Witness 2.  He attests that on May 27, 2020, while he was training King in his backyard using a "training collar," a "white woman who I had never met was in the alley behind my home." Ginyard Aff. ¶ 5.  Defendant Ginyard has submitted a photo which he indicates shows the vantage point from which Witness 2 observed his interaction with King on May 27, 2020.  *See* Def.'s Mot. to Suppress Evid. Ex. 3, ECF No. 54-3.  Defendant Ginyard claims that Witness 2 was only able to observe him for a short period of time, from approximately 70 feet away.  *See* Def.'s Mot. to Suppr. Evid. at 6.  According to Defendant Ginyard, this woman "made some comments about the way I was treating King," so Defendant Ginyard told her to "mind her business, using some expletives."  Ginyard Aff. ¶ 5.  Defendant Ginyard indicates that they then "got into an argument"; the woman said she would call "Animal Control" and Defendant Ginyard called her a "white B."  *Id.*  He claims that her report to WHS was not accurate, and that he "did not kick or abuse the dog."  *Id.*

Defendant Ginyard further attests that no one from WHS contacted him during the period between WHS's receipt of Witness 2's complaint on May 27, 2020, and the execution of the search warrant on May 30, 2020.  *Id.* ¶ 6.  However, he notes that the Case View Report indicates that HLEO Matheson came to Defendant Ginyard's address on May 29, 2020.  *See* Def.'s Suppl. Mem. at 12; Complaint 2 Case View Report at 3, Memo 5366717.  HLEO Matheson's report for that visit indicates only that it was 85 degrees, that the dog was outside and had a "shaded area"

and "appears to have W bowls." *Id.*   The Affidavit does not indicate that any WHS officer went to Defendant Ginyard's residence after receipt of the Third Complaint.

***

Based on these three complaints, HLEO Matheson submitted an Affidavit in Support of a Search Warrant, presenting the facts as described above and concluding that "Affiant believes that there is probable cause to believe at least one dog maintained at 1215 Morse St NE [is] being maintained in violation of [D.C. Code § 22-1001]."   Affidavit at 3.   As previously noted, the Search Warrant authorized law enforcement officers to search Defendant Ginyard's apartment and the "surrounding yard and property" for "[p]roperty which constitutes the commission of a crime in violation of [D.C. Code § 22–1001]," specifically "[a]nimals abused or neglected (dead or alive, born or unborn, above ground or below), documents that provide proof of ownership or a history of veterinary care, and any other evidence of animal cruelty/neglect."   Search Warrant.   The Search Warrant was executed on May 30, 2020.

## C.  HLEO ▮▮▮▮▮ Termination from WHS

During the course of supplemental briefing on Defendant Ginyard's pending motions to suppress, the Government informed the Court that HLEO ▮▮▮▮▮ had been terminated from WHS "based on an investigation concerning a use of force incident in an unrelated case" and WHS's "belie[f] that Officer ▮▮▮▮▮ was not forthcoming in his report of the surrounding circumstances of that case."   Gov.'s Suppl. Opp'n at 5.   After investigating the circumstances surrounding HLEO ▮▮▮▮▮ termination, the parties submitted supplemental pleadings addressing the circumstances of his termination.   *See* Def.'s Suppl. Reply at 3–7; Gov.'s Suppl. Reply at 12–15.   The Court shall present the facts regarding HLEO ▮▮▮▮▮ termination—to the extent they pertain to Defendant Ginyard's pending request for a *Franks* hearing.

16

The personnel records submitted to the Court indicate that HLEO ███ was terminated from WHS following a "use of force incident" on May 28, 2021—one year *after* he submitted the Affidavit to obtain the Search Warrant in Defendant Ginyard's case.   *See* Def.'s Suppl. Reply Ex. A, Stmt. of HLE ████████████████████.   In summary terms, ███████████ then ███████, ██████████ concluded that Officer ██████ had "created and escalated a situation where he then had to implement physical force." ████████████.   HLE Manager ███ also described a "pattern of similar issues with ███████ unnecessarily escalating situations," indicating that he "did not feel comfortable in ██████ judgment when left unsupervised" due to HLEO ████████████████████ ████████████   HLE Manager ███ further noted that, with regards to the same "use of force incident," HLEO ██████ had urged his colleague who witnessed the same incident to "copy his statement and present it at hers" to their supervisor.  ███

WHS's personnel records also describe some of the incidents giving rise to the "pattern" observed by HLE Manager ███.   Notably, *all* of these incidents occurred at least eight months *after* ████████████ the Affidavit in this case.   *See* Def.'s Suppl. Reply Ex. F, ████████████████████   For example, HLE Manager ███ reported in February 2021 that HLEO ██████ had "escalated" a situation with MPD officers by being "confrontational" towards them. ████████.   He also noted that "██████ respect towards others has been a specific issue that has came up in the past," noting that there had been a "few instances from the past year where [he had] act[ed] rude and rais[ed] his voice." ███

In April 2021, another report notes that HLEO ██████ had cut the "3rd row seatbelt" in his WHS vehicle in an effort to "circumvent the seatbelt alarm on the driver['s] seat." ███ ██████.   HLEO ██████ admitted to cutting the seatbelt.  ███   And, another report on the

17

same date indicates that HLEO ████████ had "submitted a letter for review with an image of [another employee's] signature that ████████ had created." ███ HLEO ████████ reportedly created this "image" without authorization. ███ HLEO ████████ explained to HLE Manager ███ that he was not using the signature "for anything malicious, but had created it to expedite sending the required letters out." ███

      Defendant Ginyard contends these incidents demonstrate that HLEO ████████████ ████████████████████████ "bear[s] directly on his lack of credibility as the affiant of the search warrant application in this case."   Def.'s Suppl. Reply at 2, 6.

## II.   DISCUSSION

      Defendant Ginyard seeks an evidentiary hearing to allow him to challenge the integrity of the Affidavit and resulting Search Warrant.   Although an affidavit offered in support of a search enjoys a "presumption of validity," the Supreme Court in *Franks v. Delaware*, 438 U.S. 154 (1978) held that in certain circumstances, a defendant can obtain an evidentiary hearing regarding the affidavit's integrity upon making a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit[.]"   *Id.* at 155–56.   The false information must have been  "necessary to the finding of probable cause."   *Id.* at 156.   A defendant may also establish that he is entitled to a *Franks* hearing on the basis of material omissions from an affidavit.   *See United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008).   "Indeed, [b]y reporting less than the total story, an affiant can manipulate the inference a magistrate will draw. To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning."   *United States v. Ali*, 870 F. Supp. 2d 10, 26 (D.D.C. 2012) (internal citation and quotation marks omitted).

A defendant seeking a *Franks* hearing must show that "(1) the affidavit contained false statements or omitted certain facts; (2) the false statements or omitted facts were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth." *Id.* at 27 (citing *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010); *Spencer*, 530 F.3d at 1007). This showing must be "substantial," "more than conclusory" and must be "accompanied by an offer of proof." *Id.* at 26 (citing *Franks*, 438 U.S. at 171). Upon making such a showing, the "Fourth Amendment requires that a hearing be held." *Franks,* 438 U.S. at 156. If a *Franks* hearing is appropriate and an affiant's "material perjury or recklessness is established by a preponderance of the evidence, the warrant 'must be voided' and evidence or testimony gathered pursuant to it must be excluded." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (quoting *Franks*, 438 U.S. at 156).

For the reasons below, the Court concludes that Defendant Ginyard has failed to make a substantial showing that the Affidavit contained materially false statements or omitted material facts, or that any of the purported deficiencies in the Affidavit were made with reckless disregard for the truth. Accordingly, the Court **DENIES** Defendant Ginyard's Motion to Suppress Evidence to the extent it seeks a *Franks* hearing.

## A.  Material False Statements or Omissions

To secure a *Franks* hearing, a defendant must show that the affidavit's false statements or omissions were "material" to the finding of probable cause. A false statement is "material" only if, "when it is set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Ali*, 870 F. Supp. 2d at 27 (internal citation and quotation marks omitted). "By corollary, omitted facts are only material if their inclusion in the affidavit would defeat probable cause." *Id.* (internal quotation marks omitted) (quoting *Spencer*, 530 F.3d at 1007); *see also United States v. Williams*, 827 F.3d 1134, 1146 (D.C. Cir. 2016) ("[N]ot just any omission is enough . . . to require

a *Franks* hearing, the omission alleged must be such that, had the omitted information been provided to the authorizing court, it would have altered the court's conclusion[.]").   However, the "mere fact that the affiant did not list every conceivable conclusion does not taint the validity of the affidavit."   *Colkley*, 899 F.2d at 301 (quoting *United States v. Burnes*, 816 F.2d 1354, 1358 (9th Cir. 1987)).

To determine whether the exclusion of a false statement or the inclusion of an omitted fact would have changed the probable cause determination, the Court considers whether the warrant would have been supported by probable cause under the "totality of the circumstances" test articulated in *Illinois v. Gates*, 462 U.S. 213 (1983).   *See Colkley*, 899 F.2d at 301.   "While each fact standing alone may be insufficient, the combination of all the facts can establish probable cause."   *United States v. Gilliam*, 167 F.3d 628, 633 (D.C. Cir. 1999).   "[T]he duty of a reviewing court is simply to ensure that the [judge issuing the search warrant] had a substantial basis for . . . concluding that probable cause existed."   *Gates*, 462 U.S. at 238–39 (internal citation and quotation marks omitted).

Defendant Ginyard argues that the Affidavit both omitted material facts and included other materially misleading statements that affected the judge's probable cause determination.   The Court next addresses each of his arguments.

### 1. Information About "Identity," "Reliability" and "Biases" of Complaining Witnesses

Defendant Ginyard first argues that the Affidavit failed to include information about the complaining witnesses' "identities, their relationship, if any, to [the] defendant, their known biases against defendant, or their reliability" and therefore misled the judge who issued the Search Warrant to conclude that these witnesses provided reliable, accurate information sufficient to establish probable cause that Defendant Ginyard had violated animal cruelty laws.   *See, e.g.,*

Def.'s Mot. to Suppress Evid. at 7, 21.   The Government counters that Defendant Ginyard's arguments regarding these purported "omissions" ignore the "independent corroboration, investigation by officers, and defendant's own admissions[.]"   Gov.'s Suppl. Opp'n at 7.   The Government argues that none of these alleged "omissions" regarding informants or witnesses were material to the judge's probable cause finding.

Before addressing Defendant Ginyard's specific arguments as to each witness, the Court provides the legal principles applicable to its evaluation of each.   In determining whether probable cause exists to issue a search warrant, a judge may rely on hearsay evidence and on information received from informants.   *See, e.g.*, *Franks*, 438 U.S. at 165; *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003).   "The task of the issuing [judicial officer] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying the hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.   In this totality-of-the-circumstances approach, a "deficiency in one may be compensated for . . . by some other indicia of reliability."   *Id.* at 233.   For example, the Supreme Court has "consistently recognized the value of corroboration of details of an informant's tip by independent police work."   *Id.* at 241.

Defendant Ginyard cites several cases for the proposition that information from anonymous or unnamed sources should not be afforded much weight in assessing whether there is probable cause for a search warrant.   *See, e.g.*, *United States Washington*, 775 F.3d 405, 408 (D.C. Cir. 2014) (informant without established reliability failed to provide predictive information confirmed by police work); *Helton*, 314 F.3d at 823 (affording "minimal weight" to uncorroborated anonymous tip).   However, these same cases also direct that information about an informant's

identity and credibility may be less critical when the affidavit contains information demonstrating independent police corroboration of the information provided by those sources.   For example, in *United States v. Glover*, a case cited by Defendant Ginyard, the court concluded that the "complete omission of information regarding [the informant's] credibility [was] insurmountable," as "information about [an] informant's credibility or potential bias is crucial."   755 F.3d 811, 816 (7th Cir. 2014).   There, the affidavit omitted known information about the informant's criminal record, his gang activity, his "prior use of aliases to deceive police," and his "expectation of payment."   *Id.* at 817.   The court reasoned that the omission of such "known, highly relevant, and damaging information" about the informant's credibility "impaired the neutral role of the magistrate in deciding whether to issue the warrant."   *Id.*   However, it also noted that the police have a "limited privilege to withhold some information to protect an informant's identity," and that "extensive corroboration may overcome the doubt inherent in relying on an informant without a track record" where "information about credibility is not available."   *Id.* at 818.

a.   Identity of Complainant 1

Defendant Ginyard first argues that the Affidavit contains no information about the identity or "basis of knowledge" of the complainant who reported to WHS in February 2020 that King was tied outside in cold weather without shelter.   *See supra* Section I(B)(1).   Defendant Ginyard, however, acknowledges that HLEO Matheson corroborated this complainant's report, by "actually observ[ing] the dog outside on a cold day in February."   Def.'s Reply at 2.   In light of HLEO Matheson's corroboration of this unidentified person's report, the omission of this complainant's identity is not material to the probable cause finding.   *See, e.g.*, *Washington*, 775 F.3d at 407–08; *United States v. Weaver*, 99 F.3d 1372 (6th Cir. 1996) ("[C]orroboration of the tip through the officer's independent investigative work is significant.").

b. <u>Identity, Reliability, and Bias of Witness 1</u>

Defendant Ginyard next argues that HLEO Matheson omitted from the Affidavit information regarding Witness 1's "strong bias and motive to fabricate against the defendant." Def.'s Mot. to Suppress Evid. at 5.   Defendant Ginyard indicates that Witness 1 is the mother of one of his children, that they have a contentious relationship, and were engaged in a custody dispute at the time of her complaint.   *See, e.g.*, Def.'s Suppl. Mem. at 9–11.   Defendant Ginyard claims that he told HLEO Moyer that he suspected that his son's mother had made this report to gain advantage in the child custody dispute.   *See id.* at 8; Ginyard Aff. ¶ 3.   However, this claim is not supported by the audio recording of HLEO Moyer's interaction with Defendant Ginyard; at most, Defendant Ginyard indicated in passing that "maybe" a "baby mama" made the report to WHS in April 2020, but provided no further details about this individual or the alleged acrimonious nature of their relationship.   4/24/20 Audio at 7:27–8:10; *see also supra* Section I(B)(2)(b).

Based on the record, Witness 1 *did* tell HLEO Moyer that Defendant Ginyard is the "father of her son," accused of him being an "abuser," and informed HLEO Moyer that she had called MPD seeking a "welfare check" on the same date.   Complaint 2 Case View Report at 2, Memo 5329516.   Defendant Ginyard contends that "[e]ven a cursory investigation" would have "demonstrated the apparent lies she made during the call to [MPD] . . . requesting the 'welfare check[,]'" which would have demonstrated the alleged contentious relationship between the two of them, as well as Witness 1's "bias" towards Defendant Ginyard.   Def.'s Suppl. Mem. at 10. He contends that WHS's failure to conduct a further investigation of the "welfare check" call to MPD and omissions about the nature of this relationship "played a significant part in misleading the reviewing judge regarding the actual strength and reliability of the allegations."   Def.'s Reply at 3.   However, the Government indicates that WHS is an "independent agency" and it is

"uncommon for them to query MPD for information related to a criminal matter unless it directly implicates the [WHS] investigation."   Gov.'s Suppl. Opp'n at 16.   According to the Government, WHS was therefore not aware of the alleged "apparent lies" made by Witness 1 to MPD when she called to request a "welfare check."   *Id.*

Defendant Ginyard's arguments also ignore the steps taken to corroborate Witness 1's report.   Notably, HLEO Moyer went to Defendant Ginyard's house and observed that King had a "weird gait" and was "walking kind of weird." 4/24/20 Audio at 1:36–2:01.   Defendant Ginyard admitted that the dog had been limping at some earlier point, but that he had not taken him to a veterinarian.   *Id.* at 2:06–2:35.   HLEO Moyer also saw "spots missing on [King's] tail" that were "dark" and that the dog was "missing fur." *Id.* at 5:29–5:50.   Although Defendant Ginyard responded that he thought the spots were from shedding, HLEO Moyer noted that it did not look like shedding to him.   *Id.* at 5:38–5:59.   Defendant Ginyard himself recognizes that these observations "could be consistent with abuse."   Def.'s Reply at 3.

In light of the steps taken to corroborate Witness 1's allegations of animal abuse, the Court finds that the Affidavit's lack of information about Witness 1's identity or reliability does not amount to a material omission entitling Defendant Ginyard to a *Franks* hearing.   The Affidavit sets out the nature of the report received by the WHS, which included allegations that "one month ago," Defendant Ginyard had "throw[n] hot water" on the dog and "throw[n] [him] down a flight of stairs."   Affidavit at 2.   Although the Affidavit does not include any information about who witnessed these alleged actions or that person's relationship to the defendant, it does detail the observations of HLEO Moyer, who investigated this report, including that he saw "missing fur" and "darkened skin" on the dog's tail and observed that the dog was limping.   *Id.*   Even absent information about Witness 1's purported "bias," HLEO Moyer's observations supply a

"substantial basis" for "concluding that probable cause existed" to issue a Search Warrant based on this report of animal abuse.   *Gates*, 462 U.S. at 238–39 (internal citation and quotation marks omitted).   Accordingly, the Court finds that the omission of information about Witness 1's "reliability" or "bias" was not material to the probable cause determination.

       c.   <u>Identity, Reliability, and Bias of Witness 2</u>

Defendant Ginyard also argues that the Affidavit failed to include information about the "potential bias" of Witness 2—specifically that he had engaged with Witness 2 in a "heated verbal argument."   Def.'s Mot. to Suppr. Evid. at 6.   He argues that the Affidavit "does not indicate whether the complainant had any interaction with Mr. Ginyard as a result of the alleged incident and if so, whether the complaint could have been influenced by the complainant's emotion, anger, or bias against him."   Def.'s Suppl. Mem. at 12.   HLEO Matheson noted in the Case View Report that he was aware that Witness 2 had a "heated verbal argument" with Mr. Ginyard.   Def.'s Mot. to Suppress Evid. at 6–7.

Based on Defendant Ginyard's own affidavit, the "argument" between him and Witness 2 was based only on how he was treating his dog.   *See, e.g.*, Ginyard Aff. ¶ 5; *supra* Section I(B)(3)(b).   Therefore, it is unclear to the Court how this interaction demonstrated any "bias" by the witness that would have altered the probable cause determination in this case.   Rather, the Court agrees with the Government's view "that this [alleged] occurrence may have caused [Witness 2] to argue with the defendant is a reasonable expectation, as the [sight] of mistreatment would cause outrage . . . from a reasonable bystander" and that there is no support on the record for "[a]ny suggestion of greater bias" or a "more extensive dispute" between Witness 2 and Defendant Ginyard.   Gov.'s Suppl. Opp'n at 19–20.

Defendant Ginyard also argues that the Affidavit omits information about the reliability of Witness 2's observations—namely, that she was only able to observe Defendant Ginyard "for a brief period of time" and her "observations were from a considerable distance," "at least 70 feet away," from Defendant Ginyard and King, so there "was ample reason to believe that she was mistaken about the details of her complaint." Def.'s Mot. to Suppress Evid. at 6. Witness 2 provided a written statement to WHS, in which she indicated that she had observed Defendant Ginyard "kick" the dog "in a stomping motion" through a chain-link fence from an alley approximately 80 feet behind Defendant Ginyard's residence. Witness 2 Stmt. at 1.

Although the Affidavit briefly describes the alleged conduct Witness 2 observed, it provides no information about, for example, the distance from which Witness 2 saw Defendant Ginyard and King or how clear the view was. Although Defendant Ginyard's arguments as to "materiality" of omissions about the reliability of Witness 2's complaint present a closer call than others, the Court nonetheless concludes that the inclusion of such information would not have defeated probable cause. This complaint was not an isolated allegation, but marked the third complaint about the same person allegedly abusing the same dog over a period of several months. The Court cannot view each alleged occurrence in isolation, as Defendant Ginyard posits, but must consider the "totality of the circumstances." In so doing, the Court concludes that the judge who issued the search warrant had a substantial basis for concluding that there was a fair probability that evidence of animal cruelty would be found. *See Gates*, 462 U.S. at 238.

### 2. Information about WHS's Investigation

Defendant Ginyard next argues that the Affidavit omitted facts regarding WHS's follow-up investigation after each complaint. He contends that inclusion of these facts would have altered the "probable cause" assessment because they demonstrated his "compliance" or

undermined the accuracy of the Complaints.   For the reasons discussed below, the Court does not find any of these "omissions" to be material to the probable cause determination.

First, Defendant Ginyard contends that the Affidavit omitted the fact that WHS's investigations of the First and Second Complaints were "closed" prior to date that HLEO Matheson obtained the Search Warrant.   The Case View Report indicates that WHS's investigation into the First Complaint was "closed" as of April 2, 2020 due to Defendant Ginyard's "compliance." Def.'s Suppl. Mem. at 5; *see* Complaint 1 Case View Report at 3, Memo 5315136.   Similarly, the case created upon receipt of the Second Complaint was likewise "closed" as of May 19, 2020. Def.'s Suppl. Mem. at 5; Complaint 2 Case View Report at 1.   Defendant Ginyard suggests that including information in the Affidavit about his purported "compliance" or the fact that the first two cases had been "closed" would have eliminated both occurrences from the issuing judge's probable cause determination.   Ginyard Suppl. Mem. at 6.   This argument is unpersuasive.   The fact that WHS did not observe any repeated violations does not negate that the violations giving rise to the complaints did occur.

Defendant Ginyard further argues that the inclusion of the statement that HLEO Matheson visited his property "no less than five times" was "misleading," because it was "included in a way that conveyed to the reviewing judge that those visits, and "the observations during those visits" supported the affiant's conclusion that there was probable cause to believe that the dog is being maintained in violation of animal cruelty laws.  Def.'s Suppl. Mem. at 7.   Instead, he contends that these five visits led to the case being closed because "compliance was met."   Def.'s Suppl. Mem. at 7.   The Court is also unpersuaded by this argument.   As the Affidavit indicates, HLEO Matheson only responded in person to the First Complaint.   *See* Affidavit at 1.   HLEO Moyer investigated the Second Complaint.   *See id.* at 2.   It also indicates that HLEO Matheson "visited

the property no less than five times[,]" from which the issuing judge could have inferred that HLEO Matheson did not observe any violations of D.C. animal cruelty laws other than what he reported in the Affidavit.

Next, Defendant Ginyard argues that, with respect to the Second Complaint, the Affidavit should have explained discrepancies (1) between the initial report received by an unidentified caller (who recounted allegations made to that person by Witness 1) and Witness 1's own allegations made directly to WHS; and (2) between Witness 1's report and what HLEO Moyer actually observed.   However, the Affidavit *did* allow the issuing judge to consider these discrepancies by recounting the allegations provided in the initial complaint to WHS, HLEO Moyer's direct contact with Witness 1, and then HLEO Moyer's investigation.   *See* Affidavit at 2 (stating that unidentified caller heard from Witness 1 that King had been "thrown down stairs, burned with hot water, and hurt on a daily basis"); *id.* (Witness 1 stated that "approximately one month ago W1 observed [Defendant Ginyard] throw [King] down a flight of stairs"; that King "was limping after this and was not provided with veterinary care"; that Witness 1 had seen Defendant Ginyard "throw hot water on [King] which resulted in a spot of fur missing on [King's] side"; and that "there is a hole in the wall of the residence due to [Defendant Ginyard] throwing [King] at the wall." ); *id.* (stating that HLEO Moyer "observed [King] was walking with an uneven gait"; that he "observed spots of missing fur and darkened skin on King's tail"; and that Defendant Ginyard confirmed that King had not been treated by a veterinarian).   By including this information, the Affidavit allowed the issuing judge to assess how the report to WHS varied from what HLEO Moyer was able to corroborate.   And, despite these discrepancies, the issuing judge concluded that what HLEO Moyer *did* observe established probable cause to search Defendant Ginyard's residence.

Finally, as to the Third Complaint, Defendant Ginyard contends that the Affidavit omitted the fact that HLEO Matheson went to Defendant Ginyard's residence on May 29, 2020—one day after WHS received the Third Complaint and the same date that HLEO Matheson swore the Affidavit in Support of the Search Warrant Application.   Def.'s Suppl. Mem. at 12.   The Case View Report entry dated May 29, 2020 notes only that it was "85*f, [dog] has shaded area, appears to have W bowls."   Complaint 2 Case View Report at 3, Memo 5366717.   Defendant Ginyard argues that the omission of this fact was "material" because, had it been included, the issuing judge would have been aware that HLEO Matheson did not observe any evidence corroborating Witness 2's complaint.   *See* Def.'s Suppl. Mem. at 12.   The Government does not specifically address this point in any of its pleadings.   The Court concludes that inclusion of this fact would not have defeated the issuing judge's probable cause determination.   As previously noted, the Affidavit and Search Warrant did not rest on a single, isolated incident, but was issued based on a series of complaints and an investigation of the course of several months.   Taking into account all of the information presented to the issuing judge in the Affidavit, the Court finds that he had a substantial basis for finding that probable cause existed to search for evidence of animal cruelty violations.

### 3. Information About Affiant's Credibility

Finally, in his most recent supplemental pleading, Defendant Ginyard argues that the Affidavit omitted "information about the credibility of the affiant himself."   Def.'s Suppl. Reply at 11.   Defendant Ginyard contends that HLEO Matheson "placed directly at issue his experience and claimed expertise as an animal cruelty law enforcement officer" by stating that he had been employed by WHS since July 2019, and had previously worked as a "cruelty investigator" in New Hampshire.   *Id.* at 12; *see* Affidavit at 1.   Defendant Ginyard argues that without an evidentiary hearing "[HLEO] Matheson's assertions about his prior experience and his performance cannot be

properly tested." Def.'s Suppl. Reply at 12. However, a "mere desire to cross-examine" is an insufficient basis to mandate an evidentiary hearing. *Franks*, 438 U.S. at 171.

Finally, Defendant Ginyard argues that the Affidavit omitted information about ███████ ████████ "credibility and misconduct issues," including "damaging information regarding his HLE[O] record, which resulted in the termination of his employment," undermined "that judge's ability to assess ████████ credibility and perform the judge's required role as a neutral arbiter of probable cause." Def.'s Suppl. Reply at 13. However, the misconduct to which Defendant Ginyard alludes—described *infra* Section II(B)—did not occur until months *after* ███████ ██████ the Affidavit in this case. His argument that this information somehow could have been included in the Affidavit is misplaced.

## B. Affiant's Reckless Disregard for the Truth

In addition to showing that an affidavit in support of a search warrant contained a misleading statement or omitted material facts, a defendant seeking a *Franks* hearing must allege "deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *United States v. Gaston*, 357 F.3d 77, 80 (D.C. Cir. 2004). "Determining whether an omission was made recklessly presents particular difficulties" because "[a]ll storytelling involves an element of selectivity," and courts "cannot demand that police officers relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip." *Ali*, 870 F. Supp. 2d at 28 (quoting *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000)); *see also Colkley*, 899 F.2d at 300 ("An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation."). "[O]missions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know." *Ali*, 870 F. Supp. 2d at 29 (internal citations omitted).

Because "an affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation," the defendant's "burden in demonstrating intentionality in the context of an omission is high." *United States v. Pulley*, 987 F.3d 370, 376–77 (4th Cir. 2021) (internal citation and quotation marks omitted)).   However, an officer cannot "make unilateral decisions about the materiality of information" or "merely inform the magistrate or judge of inculpatory evidence." *Wilson*, 212 F.3d at 787.

Defendant Ginyard argues that the "extent of the material information omitted, combined with the inclusion of information in a misleading way, demonstrates that the omissions and misleading statements by the affiant were done knowingly or with reckless disregard for the truth." Def.'s Suppl. Mem. at 4.   In other words, he contends that the omissions and "misleading statements" themselves were sufficient evidence to support "a reasonable inference of recklessness, requiring an evidentiary hearing." *Id.* at 2–3.   Although the Court "cannot infer recklessness solely from an affiant's alleged awareness of" exculpatory information, it can draw such an inference where "the omitted information was critical to the probable cause determination." *Ali*, 870 F. Supp. 2d at 29 (internal citations and quotation marks omitted). Because the Court has concluded that none of the omissions or "misleading" statements were material to the probable cause determination, the Court disagrees that "recklessness" can be inferred from these omissions and/or statements.   Moreover, Defendant Ginyard has not made any offer of proof demonstrating that any particular statement or omission was made with "reckless disregard for the truth" necessitating a *Franks* hearing.

Instead, Defendant Ginyard contends that HLEO █████████ "misconduct and disciplinary record establish his general unreliability and lack of credibility as an affiant" and "mandate further that evidentiary hearings be held on . . . the validity of the warrant application[.]"   Def.'s Suppl.

31

Reply at 2.   He argues that the acts of misconduct that led to HLEO ███████ termination from WHS evince a "pattern and history of misconduct and malfeasance," which "bear directly on his lack of credibility as the affiant."   *Id.* at 6.

To be sure, the circumstances surrounding HLEO ██████ termination constitute unprofessional conduct or, as his WHS supervisor described it, perhaps a lack of "emotional intelligence" or judgment.   *See supra* Section I(C).   But it is unclear to the Court how these disciplinary issues bear on the Affidavit at issue in this case.   None of them involved swearing false affidavits before a judicial officer.   And they all occurred months *after* HLEO ████ submitted his Affidavit in this case.   The Court is not persuaded that these examples of professional misconduct evidence any deliberate falsehood or reckless disregard for the truth with respect to the Affidavit at issue *in this case.*   Accordingly, Defendant Ginyard has not sustained his burden of demonstrating that he is entitled to a *Franks* evidentiary hearing.

### III.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant Ginyard's Motion to Suppress Evidence to the extent it seeks a *Franks* hearing.   An appropriate Order accompanies this Memorandum Opinion.

**Date**: May 2, 2022                           _____/s/_____
                                                        **COLLEEN KOLLAR-KOTELLY**
                                                        United States District Judge