# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL DONALD GINYARD, JR.,<br><br>Defendant. | Criminal Action No. 20-155 (CKK) |

## MEMORANDUM OPINION
(August 25, 2022)

Defendant Michael Donald Ginyard, Jr. is charged by Indictment with unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g). This charge arises from the recovery of a pistol and ammunition during the execution of a search warrant at Defendant Ginyard's residence on May 30, 2020. The search warrant was obtained by an officer of the Washington Humane Society ("WHS"), based upon an affidavit detailing three complaints that Defendant Ginyard had mistreated his dog, in violation of D.C. Code § 22–1001, *et seq*.

Defendant Ginyard has filed a [54] Motion to Suppress Evidence obtained as a result of the search and a [55] Motion to Suppress Statements made to law enforcement officers during the execution of the search. In an earlier [110] Memorandum Opinion, the Court denied in part Defendant Ginyard's [54] Motion to Suppress Evidence to the extent it sought a *Franks* hearing to challenge the integrity of the Affidavit submitted in support of the search warrant. *See* Mem. Op. at 18–19. The Court found that Defendant Ginyard had failed to make a "substantial showing" that the Affidavit contained "materially false statements or omitted material facts, or that any of the purported deficiencies in the Affidavit were made with reckless disregard for the truth." *Id.* at 19. The Court reviewed in detail the various alleged "false statements" and "material omissions"

relied upon by Defendant Ginyard to challenge the Affidavit, and concluded that the exclusion of the purported misleading statements or inclusion of the alleged omissions would not have defeated the finding of probable cause.

The Court now addresses the arguments remaining in Defendant Ginyard's Motion to Suppress Evidence, which hinge on alleged deficiencies with the Search Warrant itself and challenges to the reasonableness of the execution of the search.   In addition, the Court addresses Defendant Ginyard's Motion to Suppress Statements, in which he seeks to suppress statements made to law enforcement officers during the execution of the search warrant.   Upon careful consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court **DENIES** the [54] Motion to Suppress Evidence and **GRANTS IN PART** and **DENIES IN PART** the [55] Motion to Suppress Statements.

---

[1] The Court's consideration has focused on the following pleadings and accompanying exhibits:

- Defendant's Motion to Suppress Tangible Evidence and Statements ("Def.'s Mot. to Suppress Evid."), ECF No. 54;
- Defendant's Motion to Suppress Statements ("Def.'s Mot. to Suppress Stmts."), ECF No. 55;
- United States' Opposition to Defendant's Motions to Suppress ("Gov.'s Opp'n"), ECF No. 57;
- Reply to Government's Opposition to Defendant's Motions to Suppress ("Def.'s Reply"), ECF No. 59;
- Supplemental Memorandum of Facts and Law in Support of Motions to Suppress Tangible Evidence and Statements ("Def.'s Suppl. Mem."), ECF No. 68;
- United States' Supplemental Opposition to Defendant's Motions to Suppress ("Gov.'s Suppl. Opp'n"), ECF No. 75;
- Defendant's Reply to Government's Supplemental Opposition to Defendant's Suppression Motions ("Def.'s Suppl. Reply"), ECF No. 91-1;
- United States' Reply in Opposition to Defendant's Reply (and Previous Motions to Suppress) ("Gov.'s Suppl. Reply"), ECF No. 96;
- Joint Notice of Filing Regarding Statements at Issue in Defendant's Motion to Suppress Statements ("Joint Notice"), ECF No. 109;
- Government's Supplemental Motions Evidence Regarding Search Warrant Protocols and Criminal Records Protocols ("Gov.'s Suppl. Evid."), ECF No. 114; and
- Defendant's Response to the Government's Supplemental Motions Evidence Regarding Search Warrant Protocols ("Def.'s Resp. to Gov.'s Suppl. Evid."), ECF No 117.

In addition, the Court considers the arguments made by the parties during the motions hearing on June 29, 2022.

## I.   BACKGROUND

### A.  Procedural Posture

On May 29, 2020, Judge Steven Wellner of the Superior Court of the District of Columbia ("Superior Court") authorized a search warrant (the "Search Warrant") permitting law enforcement officers to search Defendant Ginyard's residence and the "surrounding yard and property."   Def.'s Mot. to Suppress Evid. Ex. 1, Search Warrant, ECF No. 54-1.   In so doing, Judge Wellner relied on an affidavit submitted by Humane Law Enforcement Officer ("HLEO") Ian Matheson (the "Affidavit"), which detailed three complaints received by WHS between February and May 2020, alleging that Defendant Ginyard had failed to provide adequate shelter for, improperly tethered, and otherwise abused his dog.[2]   *See* Def.'s Mot. to Suppress Evid. Ex. 2, Affidavit, ECF No. 54-2. Judge Wellner concluded that there was probable cause to search Defendant Ginyard's apartment and the "surrounding yard and property" for "[p]roperty which constitutes the commission of a crime in violation of [D.C. Code § 22–1001]," specifically "[a]nimals abused or neglected (dead or alive, born or unborn, above ground or below), documents that provide proof of ownership or a history of veterinary care, and any other evidence of animal cruelty/neglect."[3]   Search Warrant.

On May 30, 2020, officers of the Metropolitan Police Department ("MPD") assisted WHS in executing the search.   Compl., Stmt. of Facts, ECF No. 1-1.   During the search, an MPD officer recovered from a filing box inside a bedroom closet a .40 caliber semiautomatic handgun, loaded with one round of ammunition in the chamber and eleven rounds of ammunition in a

---

[2] These three complaints are discussed in greater detail *infra* Section I(B).

[3] Pursuant to D.C. Code § 22–1005, when a "complaint is made by any humane officer of the Washington Humane Society on oath or affirmation, to any magistrate authorized to issue warrants in criminal cases, that the complainant believes, and has reasonable cause to believe, that the laws in relation to cruelty to animals . . . being violated in any particular building or place," the magistrate, "if satisfied that there is reasonable cause for such belief, shall issue a search warrant, authorizing any marshal, deputy marshal, police officer, or any humane officer of the Washington Humane Society to search such building or place."   D.C. Code § 22–1005.

fourteen-round capacity magazine.   *Id.*   A criminal history check showed that Defendant Ginyard had a prior felony conviction in Superior Court for carrying a pistol without a license, for which he was sentenced to twenty (20) months.   *Id.*   Defendant Ginyard was charged in this case with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).   *See* Indictment, ECF No. 16.

On April 16, 2021, Defendant Ginyard filed his pending Motions to Suppress Tangible Evidence and Statements.   In the former, Defendant Ginyard challenges the validity of the Affidavit, argues that the Search Warrant was overbroad and unsupported by probable cause, and contends that the execution of the search was unreasonable.   *See generally* Def.'s Mot. to Suppress Evid.   Based on these alleged Fourth Amendment violations, Defendant Ginyard contends that the good faith exception to the exclusionary rule does not apply, and that the firearm and ammunition obtained during the search should be suppressed.   *See id.* at 20–22.   Defendant Ginyard also argued that he was entitled to a hearing under *Franks v. Delawar*e, 438 U.S. 154 (1978), to establish that purported omissions from the Affidavit "were material and were made . . . knowingly or with reckless disregard for the truth."   *See* Def.'s Mot. to Suppress Evid. at 21.   The Court rejected Defendant Ginyard's request for a *Franks* hearing on May 2, 2022.   *See* Order, ECF No. 98; Mem. Op. (Redacted), ECF No. 110.

In his Motion to Suppress Statements, Defendant Ginyard argues that statements he made to law enforcement officers during the execution of the Search Warrant should be suppressed because he was not advised of his *Miranda* rights when he was handcuffed in his living room while the search warrant was executed.   *See generally* Def.'s Mot. to Suppress Stmts.

On June 29, 2022, the Court held a hearing regarding the remaining issues in Defendant Ginyard's pending suppression motions. *See* Minute Order (June 29, 2022). Although originally scheduled to be an evidentiary hearing, neither party presented any witness testimony. During the motions hearing, the Government indicated that MPD had been aware of Defendant Ginyard's criminal history before executing the Search Warrant and that the search was executed in accordance with MPD protocols. Noting that there was no evidence on the record in support of these facts, the Court permitted the Government to submit "any supplemental evidence regarding search protocols and/or pre-search verification of Defendant's criminal history." *Id.* The Government submitted its supplemental evidence on July 13, 2022. *See* Gov.'s Suppl. Evid. Defendant responded to this supplemental evidence on August 5, 2022 and provided an additional body-worn camera ("BWC") video. *See* Def.'s Resp. to Gov.'s Suppl. Evid.

**B.  Factual Background**

Turning to the factual background underlying Defendant Ginyard's pending motions, the Court shall first present facts regarding three complaints of animal cruelty received by WHS and WHS's investigation of each complaint. Much of this discussion repeats the Court's earlier presentation of these facts, *see* Mem. Op. at 7–18; however because certain of Defendant Ginyard's challenges to the validity of the Search Warrant remain pending, such repetition is necessary context for the Court's legal analysis. After describing WHS's investigation, the Court shall present the facts regarding the execution of the Search Warrant. The below discussion is based on the record currently before the Court, which includes the exhibits attached to the parties'

pleadings,[4] video from Defendant Ginyard's doorbell camera,[5] MPD's BWC videos,[6] and the supplemental evidence submitted by the Government regarding MPD's search protocols and Defendant's response thereto.

### 1.   WHS Investigation of Animal Cruelty Complaints

#### a.   First Complaint (February 2020)

According to the Affidavit, on February 21, 2020, WHS received a complaint from an anonymous source, "Complainant 1," who reported that a dog was tied outside a residence located at 1215 Morse Street NE, Washington, D.C. in cold weather and that the dog was whining. Affidavit at 1.   In response to this complaint, HLEO Matheson reported to the address and observed a "tan, male, pit bull terrier type dog tethered outside in a hazardous manner" in 34-degree weather.   *Id.*   The dog did not have "proper shelter," as required by D.C. law.   *Id.* HLEO Matheson spoke with Defendant Ginyard, the owner of the dog, "advised him regarding [D.C.] Code pertaining to Cruelty to Animals" and provided him "with information on veterinary resources."   *Id.*   Defendant Ginyard identified the dog as "King." *Id.*

Defendant Ginyard has submitted to the Court WHS's "Case View Report" corresponding to the First Complaint received by WHS.   *See* Def.'s Suppl. Mem. Ex. 1, Case View Report for

---

[4] All of the exhibits indicated on the Government's [107] Exhibit List and Defendant's [111] Exhibit List submitted in advance of the hearing on June 29, 2022 were previously part of the record in this case—except for the "Shield BWC" listed as Defendant's Exhibit 13, ECF NO. 111-1, at 2.   Defendant Ginyard submitted this video to the Court on June 29, 2022.   In addition, Defendant Ginyard submitted WHS's Special Operations Plan as an exhibit during the hearing on June 29, 2022.

[5] Defendant Ginyard submitted this video to the Court as Exhibit 4 to his Motion to Suppress Evidence.   *See* Def.'s Mot. to Suppress Evid. at 8 n.5.

[6] The Court has reviewed the following BWC videos:

- 20200530_-_SEARCH_WARRANT_-_1215_MORSE_ST_NE mp4 ("Officer Anderson BWC");
- 20200530-SWRT-1215_MORSE_ST_NE mp4 ("Officer Amengual BWC");
- 20200530-FIP-1215_MORSE_ST_NE mp4 ("Officer Blasting BWC");
- SHIELD CAMERA_1215_MORSE_ST_NE.mp4 ("Shield Camera"); and
- 20200530_-_CPWL_Execution_Of_SW_-_1215_Morse_Street_Ne-3.mp4 ("Officer Konkol BWC").

Case #C05707074 ("Complaint 1 Case View Report"), ECF No. 68-1.   An entry created by HLEO Matheson indicates that on February 21, 2020, it was "34*f, breezy . . . I obs a tan PB type dog tethered hazardously, on a short lead . . . Dog was heard to be whimpering.   No winterized shelter available."   *Id.* at 2, Memo 5278338.   HLEO Matheson noted that he informed Defendant Ginyard that his dog could not be outside without winterized shelter when the temperature was below 40 degrees.   *Id.*   Defendant Ginyard reportedly did not realize that there was a law governing such conditions.   *Id.*   HLEO Matheson also reported that he advised Defendant Ginyard "at length regarding tethering," "served a notice in hand regarding proper shelter and tethering violations," and provided Defendant Ginyard with "vet resources."   *Id.*

Defendant Ginyard does not dispute the basic facts set forth in the Affidavit and Case View Report regarding his interaction with HLEO Matheson in February 2020.   He does not dispute, for example, that his dog was outside in cold weather, whimpering, without "winterized" shelter, tied on a short lead.   *See* Def.'s Reply at 2.   He states that he explained to HLEO Matheson that he had tied the dog outside while he was cleaning the inside areas of his home.   *See* Def.'s Suppl. Mem. Ex. 3, Affidavit of Michael Donald Ginyard, Jr. ("Ginyard Aff.") ¶ 2, ECF No. 68-3.

In addition to the facts described above, WHS's Case View Report also details follow-up visits by HLEO Matheson, as well as additional complaints about his dog named King being outside in cold weather.   According to the Case View Report, HLEO Matheson returned to Defendant Ginyard's property on March 4, 2020 and noted only that the outside temperature was 64 degrees and there was "[n]o sign of tether."   Complaint 1 Case View Report at 2, Memo 5290853.   Then, on March 9, 2020, WHS received an additional complaint by an "[a]nonymous caller" who "report[ed] a dog . . . outside in the cold with no known shelter."   *Id*. at 2, Memo 5293782.   An entry on the same date indicates that "temp. was over 50 degrees.   Elected not to

go out immediately and referred to HLEO Moyer for follow up[.]"  *Id.* at 2, Memo 5294613.
Later that day, HLEO Timothy Moyer visited Defendant Ginyard's property and observed King
"lying prone in a black wire crate on porch . . . The crate was open.   I could not see if the animal
was tethered – no tether seen.   Yard appeared secure.   Crate had plastic covering on top."  *Id.* at
2, Memo 5294517.   HLEO Matheson again visited Defendant Ginyard's residence on March 10,
March 31, and April 2, 2020. *Id.* at 2–3, Memos 5300095, 5313569, 5315133.   In each of the
associated Case View Report entries, HLEO Matheson indicates only that the outdoor temperature
was more than 40 degrees, and that he observed that King was not tethered and had available a
"black wire crate" with blanket on top.  *Id.*   An additional entry dated April 2, 2020 indicates that
the case would be closed "due to compliance met."  *Id.* at 3, Memo 5315136.

Although the Affidavit does not provide specific details regarding these follow-up visits,
the additional anonymous call, or Defendant Ginyard's "compliance" in addressing the
temperature and tethering violations observed by HLEO Matheson in February 2020, it does
indicate that HLEO Matheson had "been to the property no less than five times[7] and on some
occasions has observed . . . [King] in a cage on the porch and on other occasions . . . [King] free
roaming in the yard on the property."   Affidavit at 3.

b. <u>Second Complaint (April 2020)</u>

The Affidavit next describes a second complaint received by WHS on April 24, 2020: an
anonymous complainant ("Complainant 2") relayed that an unidentified witness ("Witness 1") had
"observed [King] being thrown down stairs, burned with hot water, and hurt on a daily basis" and
knew that "[King] was injured and did not receive veterinary care."   Affidavit at 2.   The Affidavit

---

[7] As described here, HLEO Matheson first observed King in February 2020, and then made subsequent visits to
Defendant Ginyard's property on March 4, March 10, March 31, and April 2, 2020.  *See* Complaint 1 Case View
Report at 2–3.

indicates that HLEO Moyer directly contacted Witness 1, who "stated to him that approximately one month ago [Witness 1] observed [Defendant Ginyard] throw [King] down a flight of stairs[.]" *Id.* Witness 1 also reported seeing Defendant Ginyard "throw hot water" on King, which "resulted in a spot of missing fur on [King's]'s side." *Id.* Witness 1 further stated that Defendant Ginyard had thrown the dog against a wall inside his house, leaving a hole in the wall. *Id.*

According to the Affidavit, HLEO Moyer (*not* the affiant, HLEO Matheson) went to Defendant Ginyard's residence to investigate this complaint. *Id.* He observed King walking with an "uneven gait" and had "spots of missing fur and darkened skin on [his] tail." *Id.* The Affidavit notes that HLEO Moyer met with Defendant Ginyard, who denied allegations of abuse. Defendant Ginyard explained that King had been limping for approximately three weeks a few months earlier, and that he had not taken the dog to be treated by a veterinarian. *Id.* Defendant Ginyard also stated that he believed the spots of missing fur were due to shedding. *Id.*

The Government submitted to the Court an audio recording of the interaction between Defendant Ginyard and HLEO Moyer. *See* Gov.'s Suppl. Reply at 27.[8] The summary of HLEO Moyer's interaction with Defendant Ginyard contained in the Affidavit accurately recounts their conversation. HLEO Moyer informed Defendant Ginyard of the nature of the allegations received by WHS. He first explained that somebody reported that the dog had hurt his leg and noted that he had himself observed that King had a "weird gait" and was "walking kind of weird." 4/24/20 Audio at 1:36–2:01. HLEO Moyer asked Defendant Ginyard if he had ever noticed the dog walk with a limp. *Id.* at 2:01–2:06. Defendant Ginyard responded that about four months earlier, King had a limp for about three weeks. *Id.* at 2:06–2:35. HLEO Moyer advised Defendant Ginyard that he should talk to a veterinarian. *Id.* at 2:58–3:02; 3:30–3:37. Defendant Ginyard asked

---

[8] The Court received a CD containing an audio recording with the filename "1215 morse 4-24-20.m4a." The Court shall refer to this recording in citations as "4/24/20 Audio."

HLEO Moyer if the dog look injured to him, to which HLEO Moyer replied, "the dog looks like he has a weird kind of walk . . . I would imagine it's not broken or, if it was, it was healed—like you were saying, something could have gotten dislocated . . . that it's kind of resolved itself to some degree.   I don't know if he has an ongoing thing.   He doesn't look to me like he's in pain. Dogs are good at showing—at not showing, you know, that they're in pain."   *Id.* at 3:38–4:01.

HLEO Moyer then explained that a complainant had also reported that "somebody" had thrown scalding water on the dog and that the dog was burned.   *Id.* at 4:42–4:52.   Defendant Ginyard again asked HLEO Moyer if he saw anything wrong with the dog.   *Id.* at 4:53–5:02. HLEO Moyer said that he saw there were "spots missing on his tail" that were "dark" and "missing fur."   *Id.* at 5:29–5:50.   Defendant Ginyard responded that he thought the spots were from shedding.   *Id.* at 5:38–5:59.   HLEO Moyer noted that it did not look like shedding to him.   *Id.* at 5:57–5:59.   Defendant Ginyard denied the allegation that he had burned King with hot water.   *Id.* at 6:10–6:24.

Defendant Ginyard claims that the Affidavit omits certain information regarding this conversation.   First, Defendant Ginyard indicates (in his own affidavit) that he informed HLEO Moyer that he "suspected that the person who complained was the mother of my son, because she was trying to create problems for me because of visitation and custody issues we were trying to work through."   Ginyard Aff. ¶ 3.   The audio recording does not support this assertion. Defendant Ginyard repeatedly indicated to HLEO Moyer that he did know who would have made this report to WHS, but that it must have been somebody who know him "personally" to be saying "hateful" things and providing "false information," suggesting that it *could* have been a "baby mama, anything. Who knows?"   4/24/20 Audio at 7:27–8:10.   He did not explain to HLEO

Moyer, as his affidavit suggests, any details about the allegedly contentious nature of his relationship with the person he suspected to be Witness 1.

Defendant Ginyard also attests that HLEO Moyer told him during this conversation that "the dog seemed fine," but that HLEO Matheson omitted this observation from the Affidavit. Ginyard Aff. ¶ 3.   Again, based on the audio recording from this encounter, Defendant Ginyard's recollection is not entirely accurate.   Before explaining the nature of the two complaints to Defendant Ginyard, HLEO Moyer observed that there was a crate set up for King in the yard, and confirmed that Defendant Ginyard supplied the dog with water.   4/24/20 Audio at 1:15–1:25. HLEO Moyer stated, he "looks like he's … yeah."   *Id.* 1:31–1:36.   Later in their conversation, HLEO Moyer agreed that King's leg did not look broken, but, as detailed above, did note that the dog walked with a "weird" gait.   *Id.* at 1:36–2:01.

The Case View Report provides additional information about the Second Complaint.   *See* Def.'s Suppl. Mem. Ex. 2, Case View Report for Case #C05775408 ("Complaint 2 Case View Report"), ECF No. 68-2.   According to an entry by HLEO Moyer on April 24, 2020, after speaking with Defendant Ginyard, he spoke with Witness 1, who "stated that King's owner is the father of her son."   *Id.* at 2, Memo 5329516.   The witness reportedly told HLEO Moyer that she had observed Defendant Ginyard throw the dog down the stairs and that she had advised Defendant Ginyard to take the dog to be "seen" for his injury.   *Id.*   The same entry notes that the witness reported that the dog had a "spot" on his side from where Defendant Ginyard had thrown hot water on him; but it also notes that HLEO Moyer advised the witness that he had not seen a "spot."   *Id.* The witness also told HLEO Moyer that Defendant Ginyard is an "abuser" and that she "wanted a welfare check."   *Id.*   HLEO Moyer reportedly explained to her that he had met with Defendant Ginyard and observed King, but that he "needed more information from her," and asked if she

would be willing to write a statement.  *Id.*  The witness responded that she could not write a statement "at the moment," but "would make time later."  *Id.*  There is no other statement from this witness on the record.

### c.  Third Complaint (May 2020)

As detailed in the Affidavit, on May 27, 2020, a second unnamed witness—"Witness 2"—contacted WHS to report that she had seen someone kick a dog outside Defendant Ginyard's address.  Affidavit at 2.  HLEO Moyer contacted Witness 2, who provided descriptions consistent with Defendant Ginyard and King.  *Id.*  Witness 2 stated that she had seen Defendant Ginyard hold down the dog, yell at him, and stomp on his head with "enough force to cause pain, but not enough to crush the dog's skull."  *Id.*

The parties have each filed additional evidence regarding the Third Complaint—the Government has provided a witness statement from Witness 2, and Defendant Ginyard has submitted his own affidavit.  The Court shall address both, as well as additional information obtained in WHS's Case View Report.

WHS received a sworn statement from Witness 2, dated May 28, 2020.[9]  Witness 2 indicates that, on May 27, 2020 at approximately 7:15 pm, she saw a "black man" in the backyard of a residence located at 1215 Morse Street NE, yelling at a dog.  Gov.'s Suppl. Opp'n Ex. 1, Witness 2 Stmt. at 1, ECF No. 75-1.  Witness 2 indicates that she was in the alley behind the residence, about 80 feet from the building, and could see the man and the dog through a chain-link fence.  *Id.*  She observed the man "hold the dog down by the neck" and "kick[ ] the dog in the head, in a stomping motion."  *Id.*  She states that she yelled at him to stop, and he yelled back at

---

[9]  The Witness Statement is dated May 28, but it was "sworn on June 4."  *See* Gov.'s Suppl. Opp'n Ex. 1, Witness 2 Stmt. at 1, ECF No. 75-1.

her that she should mind her own business. *Id.* She responded that she would call "animal control" before walking "back down the alley and into my yard to make the call." *Id.*

Defendant Ginyard denies abusing King, but does not dispute many of the facts presented by Witness 2. He attests that on May 27, 2020, while he was training King in his backyard using a "training collar," a "white woman who I had never met was in the alley behind my home." Ginyard Aff. ¶ 5. Defendant Ginyard has submitted a photo which he indicates shows the vantage point from which Witness 2 observed his interaction with King on May 27, 2020. *See* Def.'s Mot. to Suppress Evid. Ex. 3, ECF No. 54-3. Defendant Ginyard claims that Witness 2 was only able to observe him for a short period of time, from approximately 70 feet away. *See* Def.'s Mot. to Suppress Evid. at 6. According to Defendant Ginyard, this woman "made some comments about the way I was treating King," so Defendant Ginyard told her to "mind her business, using some expletives." Ginyard Aff. ¶ 5. Defendant Ginyard indicates that they then "got into an argument"; the woman said she would call "Animal Control" and Defendant Ginyard called her a "white B." *Id.* He claims that her report to WHS was not accurate, and that he "did not kick or abuse the dog." *Id.*

Defendant Ginyard further attests that no one from WHS contacted him during the period between WHS's receipt of Witness 2's complaint on May 27, 2020, and the execution of the search warrant on May 30, 2020. *Id.* ¶ 6. However, he notes that the Case View Report indicates that HLEO Matheson came to Defendant Ginyard's address on May 29, 2020. *See* Def.'s Suppl. Mem. at 12; Complaint 2 Case View Report at 3, Memo 5366717. HLEO Matheson's report for that visit indicates only that it was 85 degrees, that the dog was outside and had a "shaded area" and "appears to have W bowls." *Id.* The Affidavit does not indicate that any WHS officer went to Defendant Ginyard's residence after receipt of the Third Complaint.

### 2.   Obtaining and Preparing for Execution of the Search Warrant

Based on these three complaints, HLEO Matheson submitted an Affidavit in Support of a Search Warrant to Judge Wellner, presenting the facts as described above and concluding that "Affiant believes that there is probable cause to believe at least one dog maintained at 1215 Morse St NE [is] being maintained in violation of [D.C. Code § 22-1001]."   Affidavit at 3.   As previously noted, the Search Warrant authorized law enforcement officers to search Defendant Ginyard's apartment and the "surrounding yard and property" for "[p]roperty which constitutes the commission of a crime in violation of [D.C. Code § 22–1001]," including "[a]nimals abused or neglected (dead or alive, born or unborn, above ground or below), documents that provide proof of ownership or a history of veterinary care, and any other evidence of animal cruelty/neglect." Search Warrant.

WHS created a Special Operations Plan ("SOP") providing an overview of the planned search.[10]   According to WHS's SOP, MPD's "Street Crimes Team" would assist with "secur[ing] the residence" before WHS officers would enter to "photo document and collect any evidence," including "documentation of animal ownership."   *See* WHS SOP at 1, 2.   MPD's Fifth District Crime Suppression Team also prepared an Operational Plan.   Gov.'s Suppl. Evid. Ex. 1, MPD's Operational Plan, ECF No. 114-1.   MPD's Operational Plan lists the "items to search for and seize," tracking the language in the Search Warrant.   *Id.* at 2.

The Government has also submitted additional information about MPD's protocols for executing search warrants, as well as an affidavit of MPD Crime Suppression Unit Officer Roberto Amengual, who assisted with executing the Search Warrant in this case.   *See* Gov.'s Suppl. Evid. Notably, MPD requires eight officers, equipped with body armor and service weapons, to be

---

[10]   As noted *supra* note 4, Defendant Ginyard submitted this exhibit to the Court at the start of the motions hearing on June 29, 2022.

present in executing a search warrant.   *See* Gov.'s Suppl. Evid. Ex. 2, MPD General Order 110.11 at 13, 15, ECF No. 114-2; Ex. 3, MPD General Order 702.03 at 10, ECF No. 114-3.   Moreover, Officer Amengual attests that "[p]er the MPD General Order 702.03 and Crime Suppression Team policy, it is part of the policy and procedure to run a COBALT/NCIC/criminal check of subjects, targets, suspects, known residents of locations where Search Warrants are to be executed." Amengual Aff. ¶ 2; *see* MPD General Order 702.03 at 11 (requiring officers to discuss during pre-warrant execution briefing "[t]he suspect's background and/or criminal history.").   According to Officer Amengual, "MPD would have run a COBALT check of Mr. Ginyard since he was the subject/resident of the location of the warrant which would have produced his criminal history for MPD to be aware of before executing the warrant."   Amengual Aff. ¶ 4.   As Defendant Ginyard notes, Officer Amengual does not indicate that he personally ran the criminal history search in advance of the officers' arrival of Defendant Ginyard's residence.   *See* Def.'s Resp. to Gov.'s Suppl. Evid. at 2, n.2.

### 3.   Execution of the Search Warrant

At approximately 3:50 pm on May 30, 2020, seven MPD officers and two WHS officers arrived at Defendant Ginyard's residence.   MPD Lieutenant Brown knocked on the front door and yelled, "Police. Search Warrant. Open the door."   Shield BWC 15:51:46–15:51:50. Three seconds later, Lieutenant Brown said "Go" to another MPD officer with a battering ram, directing him to break open the door.   *Id.* at 15:51:53.   The MPD officer struck the door twice with the battering ram, causing the door to break open on the second strike.   *Id.* at 15:51:53–15:51:55.   The MPD officers entered the house with their weapons drawn, yelling "Police. Search Warrant."   *Id.* at 15:51:55–15:52:00.   Defendant Ginyard walked from a bedroom into the living room wearing a white t-shirt and underwear.   *Id.* at 15:51:59–15:52:02.   The MPD officers directed him to get on

the ground; Defendant Ginyard complied, with his hands above his head.   *Id.* at 15:52:00–15:52:02.   An officer handcuffed him.   Anderson BWC 15:52:14–15:5216.

The front door of Defendant Ginyard's apartment opens into a living room, which has a sofa on the right side.   *Id.* at 15:52:04.   On the left side, a television hangs on the wall, next to which is a small closet.   *Id.* at 15:52:06.   The living room leads into a hallway.   *Id.* at 15:52:16–15:52:18.   There are two bedrooms on the left side of the hallway and a third on the right side.   *Id.* at 15:52:41–15:52:44.   Defendant Ginyard emerged from the first bedroom on the left, which shares a wall with the living room.   Shield BWC 15:51:58–15:52:00.   The hallway leads to a kitchen and another seating area at the rear of the house.   Anderson BWC 15:52:18-26.

The MPD officers conducted a sweep of the apartment, during which they looked in all rooms, opened closet doors, and looked under the mattress in the bedroom from which Defendant Ginyard had emerged.   Shield BWC 15:52:08–15:52:56; Anderson BWC 15:52:18–15:53:28. Defendant Ginyard remained handcuffed in the living room.   After conducting a sweep of the apartment, the MPD officers looked between the cushions of the sofa in the living room before seating Defendant Ginyard, still handcuffed, on it.   Anderson BWC 15:53:40–15:54:27.   An MPD officer stood next to Defendant Ginyard, with a hand on his shoulder.   *Id.* at 15:54:27. Defendant Ginyard remained handcuffed, seated on the sofa in the living room for the duration of the search.   *See* Gov.'s Opp'n at 5.   After a few minutes, an MPD officer helped Defendant Ginyard put on pants.   Anderson BWC 15:57:54–15:58:07.

HLEO Matheson then approached Defendant Ginyard, stated his name, indicated that he was from WHS, and explained, "We have a search warrant right now to seize the dog and search for any evidence of animal cruelty."   *Id.* at 15:54:28–15:54:36.   Defendant Ginyard asked why MPD did not just "knock on the door," but instead "bust the door in."   *Id.* at 15:54:40–15:54:50.

One MPD officer stated that they had "knocked and announced," but that this was a "no-knock search warrant." *Id.* at 15:55:17–15:55:32. The latter statement was incorrect; the Search Warrant did not authorize a "no-knock" entry.

After this exchange, HLEO Matheson showed Defendant Ginyard the Search Warrant and asked him, "To assist with the execution of the search warrant, do you have any documentation in relation to the animal?" *Id.* at 15:56:06–15:56:49. Defendant Ginyard responded, "Yes." Officer Matheson asked, "Where would it be at?" Defendant Ginyard's first response is difficult to understand, but he then answered that it would be "either in my car or the closet right here," nodding his head forward. HLEO Matheson again asked, "Either in the car or the closet, the closet right here?" to which Defendant Ginyard confirmed, "yes." *Id.* at 15:56:34–15:56:49. HLEO Matheson appeared to gesture to the closet in the living room, across from where Defendant Ginyard was seated. *Id.* at 15:56:34–15:56:49.

A few minutes later, Lieutenant Brown emerged from the first bedroom on the left and announced "1-800," which is the code word for a firearm. *Id.* at 15:58:36–15:58:38. An MPD officer approached Defendant Ginyard and asked his name; in response, Defendant Ginyard directed him to where his ID was located in the living room. *Id.* at 15:59:04–15:59:15. Another MPD officer then entered the living room from the hallway leading to the bedrooms; as one of his colleagues informed him of the "1-800," Lieutenant Brown again emerged from the bedroom into the living room and fist bumped the other officer who had entered the room from the hallway. *Id.* at 15:59:18–15:59:26.

A photograph submitted by the Government shows a pistol in the drawer of a filing shelf containing mail, receipts, and pens. *See* Gov.'s Opp'n Ex. 1, ECF No. 57-1. The Government indicates that this filing shelf was located in a closet in the first bedroom on the left side of the

hallway past the living room.   Gov.'s Opp'n at 5–6; *see also* Amengual BWC at 15:59:25–
15:59:31 (showing location of filing shelf inside closet).   Defendant Ginyard does not dispute the
location of the firearm.   Although no body-worn camera video from Lieutenant Brown has been
provided to the Court, the Government indicates that Lieutenant Brown can be heard in Officer
Amengual's BWC video, saying that he found the gun while "looking for dog paperwork."   *Id.* at
15:59:09–15:59:15.

    One MPD officer entered the bedroom, looked inside the closet, and wrote down
information about the firearm.   Kokol BWC 15:59:40–16:01:43.   He then walked outside to his
vehicle to run a "historical."   *Id.* at 16:01:53–16:01:56.   Using the computer in his vehicle, the
officer searches COBALT and online court records for information about Defendant Ginyard's
criminal history.   *Id.* at 16:08:04–16:17:33.

    In the meantime, inside the apartment, Defendant Ginyard questioned MPD officers about
their search and the meaning of the "1-800" announcement.   He asked one MPD officer if he was
"going to jail," to which the officer respond "yes," before clarifying, "Well, actually I'll take that
back . . . We gotta do some research real quick."   Anderson BWC 15:59:52–16:00:04.   Defendant
Ginyard also asked if he could use the restroom, to which an MPD officer responded, "Not right
now, man."   *Id.* at 16:00:57–16:01:10.

    An MPD officer also asked Defendant Ginyard about his criminal history.   Specifically,
one officer asked him if he had ever been arrested before, and whether he had any felony
convictions.   Defendant Ginyard responded affirmatively to both questions.   *Id.* at 16:02:57–
16:03:16.   Defendant Ginyard also asked an MPD officer if they were taking his dog, to which
the officer replied, "We're taking the dog and you also have a firearm."   Defendant Ginyard

respond, "Ok, I got a firearm in here."   The officer asked, "Is it registered?" to which Defendant

Ginyard respond, "It's not a registered firearm."   *Id.* at 16:06:20–16:06:33.

Defendant Ginyard continued to ask about the scope of the search.   An MPD officer

explained that the Search Warrant authorized them to search for "documents"—at which point

Defendant Ginyard interjected, "But I told you where the documentation was at."   An MPD

officer subsequently clarified, "Did you say the documentation was in your closet?"   Defendant

Ginyard responded, "I said in the closet," and then, "I said *that* closet," leaning his body forward

and appearing to gesture to the closet in the living room, directly across from where he was seated.

He then said, "I never told you a closet in my room.   Y'all didn't look nowhere else.   But y'all

go straight to the room in there and look for whatever y'all found."   *Id.* at 16:11:13–16:12:05.

Minutes later, an MPD officer informed Defendant Ginyard, "Obviously you're under

arrest."   *Id.* at 16:14:07–16:14:10.   Shortly after, Defendant Ginyard stated, "Like I said, I don't

know nothing about that gun in there though … I ain't the only person living here.   I don't deal

with guns, man."   An MPD officer inquired, "Have you ever been locked up for a gun?"

Defendant Ginyard said, "Yeah."   *Id.* at 16:14:32.

WHS officers seized a dog from Defendant Ginyard's residence.   Blasting BWC

16:05:40–16:06:05.   The Search Warrant Return indicates that officers seized, among a few other

items, a "tan . . . male pitbull type dog" and "vet paperwork."   Gov.'s Opp'n Ex. 2, ECF No. 57-2.

## II.   DISCUSSION

### A.  Motion to Suppress Evidence

The Fourth Amendment prohibits law enforcement from conducting "unreasonable

searches and seizures," and provides that "no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly describing the place to be searched, and the

persons or things to be seized."   U.S. Const. amend. IV.   "When police obtain evidence by way

of an unlawful search, the exclusionary rule may require exclusion of that evidence in some circumstances." *United States v. Glover*, 681 F.3d 411, 418 (D.C. Cir. 2012). However, the "exclusionary rule has limited force in cases involving a search with a search warrant," because it was "adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges." *Id.* (internal citations and quotation marks omitted). Defendant Ginyard moves to suppress the evidence obtained during the search, challenging the constitutional validity of the Search Warrant as well as the reasonableness of the search. The Court addresses each of his arguments in turn.

### 1. Search Warrant

Defendant Ginyard first challenges the validity of the Search Warrant on various grounds—contending that it was unsupported by probable cause, failed to particularly describe the items to be seized, and authorized a broader search than the facts in the Affidavit supported. *See* Def.'s Mot. to Suppress Evid. at 10–17. For the following reasons, the Court finds that none of these arguments requires suppression of the evidence obtained during the search.

### a. Probable Cause

The Fourth Amendment prescribes that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts[.]" *Illinois v. Gates*, 462 U.S. 213, 232 (1983). "[T]he task of evaluating probable cause [is] 'a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found[.]'" *United States v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013) (cleaned up) (quoting *Gates*, 462 U.S. at 238). The issuing judge's "determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (internal

citations and quotation marks omitted).   When "assessing whether a search warrant is supported by probable cause," a reviewing court considers only "whether the issuing judge had a 'substantial basis' for concluding that 'a search would uncover evidence of wrongdoing.'"   *United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (quoting *Gates*, 462 U.S. at 236).

Defendant Ginyard argues that the Affidavit did not establish probable cause that evidence of a violation of D.C. Code § 22–1001 would be found in his residence.   *See* Def.'s Mot. to Suppress Evid. at 3.   Many of Defendant Ginyard's arguments rely on claims that HLEO Matheson omitted material information or included misleading statements in his Affidavit.   The Court has previously addressed these arguments in its previous Memorandum Opinion, denying Defendant Ginyard's request for a *Franks* hearing to challenge the integrity of the Affidavit.   *See* Mem. Op. at 19–32.   After addressing in detail Defendant Ginyard's arguments regarding the Affidavit's lack of information regarding the "identity," "reliability," and "biases" of the witnesses who made the three complaints detailed *supra* Section I(B)(1), the Court concluded that Defendant Ginyard had failed to make a substantial showing that the Affidavit contained materially false statements or omitted material facts, or that any of the purported deficiencies in the Affidavit were made with reckless disregard for the truth.   *Id.*   In so doing, the Court determined the Affidavit submitted by HLEO Matheson in support of the Search Warrant established a "substantial basis for concluding that there was a fair probability that evidence of animal cruelty would be found." *Id.* at 26, 28, 29.   The Court shall not repeat its earlier discussion or re-visit its previous conclusion, but instead briefly addresses two arguments raised by Defendant Ginyard relating to the issuing judge's probable cause determination that were not explicitly addressed in its earlier Memorandum Opinion.

Defendant Ginyard argues that the information included in the Affidavit was "almost entirely hearsay," which "weighs against a finding of probable cause."   Def.'s Mot. to Suppress Evid. at 13–14.   As previously noted by the Court, "[i]n determining whether probable cause exists to issue a search warrant, a judge may rely on hearsay evidence and information received from informants."   Mem. Op. at 21 (citing *Franks*, 438 U.S. at 165; *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003)).   However, Defendant Ginyard's argument that the allegations in the Affidavit were "almost entirely hearsay" hinges on his claim that the reports made by complaining witnesses were entirely "uncorroborated."   Def.'s Mot. to Suppress Evid. at 13–14; Def.'s Reply at 3.   As the Court has already observed, WHS officers *did* take steps to corroborate the first two complaining witnesses' reports.   *See, e.g.*, Mem. Op. at 24.   And the Affidavit sets out these steps and the facts that they *were* able to corroborate, as compared to the facts reported to them by the witnesses.   *Id.* at 24–25.   Accordingly, the Court disagrees with Defendant Ginyard's characterization of the Affidavit relying "almost entirely" on "hearsay."

Next, Defendant Ginyard contends that the information contained in the Affidavit was "stale" because it included incidents that occurred months before WHS applied for the Search Warrant.   *See* Def.'s Mot. to Suppress Evid. at 15.   In so doing, he asks the Court to view each incident in isolation, and not as a pattern of conduct over a period of time. The Court finds this reasoning unpersuasive.   Rather, the Court agrees with the Government that the "three-month period covered by the affidavit does not suggest that the evidence was stale, but instead showed a continued course of conduct over an extended period of time."   Gov.'s Opp'n at 13.   And, the third alleged incident occurred mere days before HLEO Matheson sought the Search Warrant in this case.   Based on the totality of the circumstances, Judge Wellner had a substantial basis for concluding that evidence of violation of animal cruelty laws would be found at Defendant

22

Ginyard's residence.   As such, the Court shall not void the Search Warrant based on Defendant

Ginyard's argument that it was unsupported by probable cause.

        b.   Particularity and Breadth

"The Constitution limits searches by law enforcement to 'the specific areas and things for

which there is probable cause to search,' and it requires that a search 'be carefully tailored to its

justifications' and 'not take on the character of the wide-ranging exploratory searches the Framers

intended to prohibit.'"   *United States v. Manafort*, 313 F. Supp. 3d 213, 231 (D.D.C. 2018)

(quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)).  "Search warrants must be specific."

*United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006).   "Specificity has two aspects: particularity

and breadth. Particularity is the requirement that the warrant must clearly state what is sought.

Breadth deals with the requirement that the scope of the warrant be limited by the probable cause

on which the warrant is based."   *Id.* (quoting *United States v. Towne*, 997 F.2d 537, 544 (9th Cir.

1993)).   Defendant Ginyard also argues that the Search Warrant was "overbroad" and failed to

describe the items to be seized "with particularity," rendering it unconstitutional.   Def.'s Mot. to

Suppress Evid. at 16–17.

A search warrant must "particularly describ[e] the place to be searched, and the . . . things

to be seized."   *Jones v. Kirchner*, 835 F.3d 74, 79 (D.C. Cir. 2016) (internal citation and quotation

marks omitted).   "In assessing particularity, courts are concerned with realities of administration

of criminal justice."   *United States v. Dale*, 991 F.2d 819, 846 (D.C. Cir. 1993) (internal citations

and quotation marks omitted).   "The particularity requirement is fulfilled when the warrant

identifies the items to be seized by their relation to designated crimes and when the description of

the items leaves nothing to the discretion of the officer executing the warrant."   *United States v.*

*Williams*, 592 F.3d 511, 519 (4th Cir. 2010).   Defendant Ginyard contends that the Search

Warrant authorized a search for "unidentified documents of ownership or veterinary care of unidentified animals, and any other evidence of animal [mistreatment]" and failed to "particularly describ[e] the items to be seized," "enabl[ing] the police to conduct a general sweep of the residence for evidence unrelated to the suspected crime described in the affidavit."   Def.'s Mot. to Suppress Evid. at 16–17 (internal quotation marks omitted).   The Court disagrees with this characterization of the Search Warrant. "[A] warrant generally satisfies the particularity requirement when it allows officers 'to seize only evidence of a particular crime.'"   *Manafort*, 313 F. Supp. 3d at 232 (quoting *United States v. Young*, 260 F. Supp. 3d 530, 546 (E.D. Va. 2017); *United States v. Fawole*, 785 F.2d 1141, 1144 (4th Cir. 1986)).   For example, in *Manafort*, the court found that a warrant authorizing law enforcement officers to search for and seize "any and all financial records" related to three specified offenses was sufficiently particularized under the Fourth Amendment.   *See id.* at 233–34.   Here, the Search Warrant limited the officers to searching for documents "provid[ing] proof of ownership or a history of veterinary care" and animals "abused or neglected."   Search Warrant at 1.   It did not authorize the police to search for evidence "unrelated" to the crime alleged in the Affidavit, but plainly limited the scope of the evidence to that "*of animal cruelty/neglect.*"   *Id.* (emphasis added).   Each of these categories is directly linked to the animal cruelty offense identified in the Search Warrant and the facts contained in the Affidavit.   Therefore, the Court finds the Search Warrant to be sufficiently particularized.

Defendant Ginyard also argues that the Search Warrant was unconstitutionally overbroad. "Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based."   *Manafort*, 313 F. Supp. 3d at 234 (quoting *Hill*, 459 F.3d at 973; *Towne*, 997 F.2d at 544).   Defendant Ginyard contends that the Search Warrant should have

"limited the scope of the search to items related to the one dog that was the subject of the allegations," Def.'s Mot. to Suppress Evid. at 17, but instead permitted a search for "broad list of items" which were "largely unconnected to the [A]ffidavit's allegations regarding the one dog in question." Def.'s Reply at 12.   For example, the Search Warrant authorized law enforcement officers to search for and seize "animals" (plural) "abused or neglected (dead or alive, born or unborn, above ground or below)," despite the fact that the Affidavit detailed alleged abuse of a single dog.

As to Defendant Ginyard's contention that the Search Warrant was overbroad in authorizing a search for multiple animals (as opposed to a single dog), the Court agrees with the Government's characterization of this as a "common sense" application of probable cause that "any other animals located within the home may have suffered abuse" based on the information contained in the Affidavit of repeated abuse of the victim animal.   Gov.'s Opp'n at 13.   But to the extent the Search Warrant authorized WHS to search for "dead" "unborn" animals and animals "below" ground, the Court does find these categories to be overbroad based on the allegations contained in the Affidavit.   The facts presented in the Affidavit do not suggest that any such evidence would be found at Defendant Ginyard's residence.   However, the Court shall not void the Search Warrant based on the inclusion of these categories because, as set forth below, it concludes that the officers relied on the Search Warrant in good faith in executing the search. And, more importantly, there is no suggestion on the record that law enforcement officers located the firearm or ammunition while searching for "dead" or "unborn" animals "underground." Rather, the firearm was discovered in a closet while MPD officers were searching for documents regarding the subject dog's veterinary care and/or ownership.

### 2.   Good Faith Exception to the Exclusionary Rule

The Government argues that, even if the Court identifies a defect in the Search Warrant, the "good faith reliance exception" articulated by the Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984), applies.   Gov.'s Opp'n at 17–18.   "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination[.]"   *Leon*, 468 U.S. at 921. Accordingly, the Supreme Court held that evidence seized in reasonable, good-faith reliance on a search warrant need not be suppressed even if the warrant was unsupported by probable cause. *Id.* at 922.   "So long as the officer relied in objective good faith on the issuing judge's determination, reviewing courts may not apply the exclusionary rule."   *United States v, Spencer*, 530 F.3d 1003, 1006–07 (D.C. Cir. 2008) (citing *Leon*, 468 U.S. at 922–23).   "The basic rule, in short, is that the police, having turned the probable cause decision over to another person, . . . are generally entitled to presume that the magistrate knows what he is doing."   *Id.* at 1007 (internal citation and quotation marks omitted).   This "good faith exception" to the exclusionary rule applies not only when a reviewing court concludes that the affidavit in support of the warrant lacks probable cause, but also to warrants later found to be "overly broad."   *See United States v. Maxwell*, 920 F.2d 1028, 1034 (D.C. Cir. 1990).

To the extent Defendant Ginyard contends that the *Leon* exception does not apply because the Affidavit contained false or misleading statements or material omissions, *see* Def.'s Mot. to Suppress Evid. at 21, the Court has thoroughly reviewed and rejected those claims in its earlier Memorandum Opinion.   Moreover, based on the Court's previous conclusion that the Search Warrant was supported by probable cause and sufficiently particular in describing the items to be seized, the Court declines to suppress the evidence on the basis that the Affidavit was "so lacking in indicia of probable cause as to render official belief in existence entirely unreasonable."   *Leon*,

468 U.S. at 923.   Finally, although the Court noted that the Search Warrant was overbroad to the extent it authorized a search for "dead" or "unborn" animals "below ground," there is no indication on the record that officers searched for such items—much less that the firearm and ammunition were discovered while doing so.   In sum, the Court concludes that the officers "reasonably relied" on the warrant in good faith, and therefore declines to order the suppression of evidence seized pursuant to it.   *Maxwell*, 920 F.2d at 1034.

### 3.   Reasonableness of the Search

The Court next addresses Defendant Ginyard's argument that suppression of evidence seized during the search is required because the manner in which the officers forced entry into his apartment and executed the search was unreasonable.   He argues that the law enforcement officers violated the knock and announce rule and that the "execution of the warrant involved an outrageous and unreasonable abuse of police power[.]"   Def.'s Mot to Suppress Evid. at 8.

Agents executing a search warrant must do so "in a reasonable manner, appropriately limited to the scope and intensity called for by the warrant."   *United States v. Heldt*, 668 F.2d 1238, 1256 (D.C. Cir. 1981); *see also Dalia v. United States*, 441 U.S. 238, 258 (1979) ("[T]he manner in which a warrant is executed is subject to later judicial review as to its reasonableness."). "Deciding whether officers' actions were reasonable requires [the court] to balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'"   *United States v. Ankeny*, 502 F.3d 829, 836 (9th Cir. 2007) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (internal quotation marks omitted).   The proponent of a motion to suppress bears the burden of establishing that his Fourth Amendment rights were violated by the challenged search or seizure.   *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).

"[The] common-law knock and announce principle forms a part of the reasonableness inquiry under the Fourth Amendment." *Wilson v. Arkansas*, 514 U.S. 927, 930 (1995). "The Fourth Amendment requires law enforcement officers, before entering the premises to be searched, to announce their presence and provide residents an opportunity to open the door[.]" *Kirchner*, 835 F.3d at 79 (citing *Wilson*, 514 U.S. at 931–32). Defendant Ginyard contends that the MPD officers violated the "knock and announce" requirement by failing to "appropriately announce their presence" and "provide Ginyard an opportunity to answer the door before they forcibly entered his apartment." Def.'s Mot. to Suppress Evid. at 18–19. He claims that an officer "knocked briefly on the door, announced his authority in a barely audible voice, and then hesitated no more than a few seconds before directing officers to break in defendant's door." *Id.* at 19.

The Court has thoroughly reviewed the videos showing the MPD officers' entry. Recognizing that Defendant Ginyard was inside the house and may have heard the announcement at a different volume, based on the videos, MPD Lieutenant Brown spoke in a clear, loud voice announcing "Police. Search Warrant. Open the door" after knocking three times. Shield BWC 15:51:46–50. However, the MPD officers did not provide Defendant Ginyard with sufficient time to respond; only three seconds elapsed between the knocks and announcement and Lieutenant Brown's directive to another MPD officer to break in the door. Based on this Circuit's binding precedent, a three-second wait is insufficient. *See United States v. Crippen*, 371 F.3d 842, 843, 845 (D.C. Cir. 2004) (four-second wait held insufficient); *but see United States v. Southerland*, 466 F.3d 1083 (D.C. Cir. 2006) (ten-second wait was reasonable to allow defendant to open door). Although a violation of the knock and announce requirement does not alone compel suppression of evidence, *Hudson v. Michigan*, 547 U.S. 586, 594 (2006), it does factor into the Court's "reasonableness" inquiry, *Wilson*, 514 U.S. at 930.

Defendant Ginyard argues that the officers' manner of entry—including the insufficient time afforded to him to answer the door and use of a battering ram—as well as the manner in which they executed the search "involved an outrageous and unreasonable abuse of police power," rendering the search unreasonable and requiring suppression of the evidence obtained as a result of thereof.  Def.'s Mot. to Suppress Evid at 19.   He points out that approximately seven MPD officers (with two WHS officers) carried out the search, and that they were wearing "tactical gear and carrying weapons, shields, and a battering ram." *Id.* at 8.   After only three seconds, the officers broke open the door, encountered Defendant Ginyard in the hallway and "ordered" him to the ground "at gunpoint." *Id.* at 9.   Defendant Ginyard was then handcuffed and was required to remain in handcuffs for the duration of the search.   Defendant Ginyard contends that this conduct was "unreasonable" in light of the nature of the alleged offense (animal cruelty) and his past "cooperation" with WHS when they responded to the first two complaints. *Id.* at 19.   In sum, he contends that the manner of conducting the search warrant—including the knock and announce violation—was disproportionate to the alleged offense for which the warrant was authorized, and therefore unreasonable under the Fourth Amendment. *Id.*; *see also* Def.'s Reply at 4–6.

In assessing whether the officers' manner of entry, display of weapons, and conduct in executing the warrant were "reasonable," the Court can consider, for example, the police's "legitimate concerns about their safety in entering and searching the house," as well as the use of force, and/or "the extent of the property damage," if any. *See Ankeny*, 502 F.3d at 836–37. During the motions hearing and in their supplemental pleadings, the parties dispute the extent to which the MPD officers had "legitimate concerns" about their safety based on whether or not they were aware of Defendant Ginyard's criminal history *before* executing the search warrant.   The Government points to Officer Amengual's affidavit, attesting that a criminal history check "would

have" been conducted in advance of executing the search warrant, in accordance with general practices and MPD's protocols, and therefore the MPD officers would have known in advance that Defendant Ginyard had a prior conviction for a firearm-related offense.   *See* Gov.'s Suppl. Evid. Defendant Ginyard notes, however, that MPD Officer Konkol appears to have conducted a criminal history check *during* the execution of the search warrant—suggesting that MPD officers were not aware of his criminal history until after the firearm was discovered during the search.[11] *See* Def.'s Resp. to Gov.'s Suppl. Evid.   As a practical matter, Defendant Ginyard's reliance on Officer Konkol's research during the execution of the search does not necessarily negate Officer Amengual's statement that a criminal history check "would have" been run prior to MPD's arrival at Defendant Ginyard's residence.   Amengual Aff. ¶ 4.

Notwithstanding the factual dispute about whether or not MPD and WHS officers were aware of Defendant Ginyard's criminal history prior to entry, the Court shall not suppress the firearm and other tangible evidence obtained from the search because "[t]he alleged Fourth Amendment violation and the discovery of the evidence lack the causal nexus that is required to invoke the exclusionary rule."   *Ankeny*, 502 F.3d at 836.   "The principle that the exclusionary rule applies only when discovery of evidence *results* from a Fourth Amendment violation is well-established."   *Id.* (emphasis added); *see, e.g.*, *Hudson*, 547 U.S. at 592 ("[B]ut-for causality is . . . a necessary . . . condition for suppression."); *Segura v. United States*, 468 U.S. 796, 804 (1984) (noting that the exclusionary rule applies to "evidence obtained as a direct result of an illegal search or seizure," or "found to be derivative of an illegality"); *United States v. Pulliam*, 405 F.3d 782, 791 (9th Cir. 2005) (denying suppression because "the indispensable causal connection" between

---

[11]  Defendant Ginyard also observes that the MPD Execution Plan did not select "firearm" as a factor to be considered in executing the warrant.   *See*  Def.'s Resp. to Gov.'s Suppl. Evid. at 3–4.   The Court does not find this point to be persuasive, as Defendant Ginyard's prior felony conviction would have precluded him from possessing a firearm, and because the firearm obtained as a result of the search was apparently unregistered.

the unlawful act and discovery of the evidence was absent).    In *Hudson*, for example the Supreme

Court declined to apply the exclusionary rule based on a knock-and-announce violation, explaining

that "the constitutional violation of an illegal *manner* of entry was *not* a but-for cause of obtaining

the evidence" because "[w]hether that preliminary misstep had occurred or not, the police would

have executed the warrant they had obtained, and would have discovered the gun and drugs inside

the house[.]"    547 U.S. at 592.

Here, there is no indication that discovery of the firearm and ammunition was causally

related to the manner of the officers' entry or the manner in which they executed the search.

Pursuant to the Search Warrant authorizing them to seize "documents that provide proof of

ownership or a history of veterinary care," the officers looked in the drawer of a filing box in a

closet for such paperwork.    Beyond contesting the inclusion of these documents in the Search

Warrant, Defendant Ginyard does not argue that searching for documents in a closet was

unreasonable.[12]    Accordingly, the Court declines to suppress the evidence based on Defendant

Ginyard's contention that the knock and announce violation, the officers' manner of entry and

conduct in executing the search was unreasonable.

As a final point, Defendant Ginyard suggests that it was unreasonable for the MPD officers

to search for documents related to veterinary care and dog ownership in the closet of his bedroom

because he told them that these records were located in his car or in the closet "right here,"

appearing to refer to the closet in the living room.    Anderson BWC 15:56:34–15:56:49.

However, Defendant Ginyard cites no legal authority supporting the proposition that officers are

restricted to searching for items specified in a search warrant to the locations where a defendant

---

[12] In his response to the Government's supplemental evidence, Defendant Ginyard suggests that the fact that the firearm was recovered by Lieutenant Brown, who was not designated in MPD's operational plan as a "search officer," undermines the reasonableness of the search.    *See* Def.'s Resp. to Gov.'s Suppl. Evid. at 6.    The Court does not find this point to have any bearing on its determination of whether or not the search was executed in a reasonable manner.

tells them the evidence is located.   Rather, it was reasonable for MPD officers to search for the documents specified in the Search Warrant in the bedroom closet, where other mail and paperwork were stored.   *See, e.g.*, *United States v. Stoltz*, 683 F.3d 934, 938 (8th Cir. 2012) (concluding that officers' search of the defendant's wallet pursuant to search warrant authorizing search for "receipts" was appropriate because "receipts may be found in a wallet");   *United States v. Williams*, 687 F.2d 290, 293 (9th Cir. 1982) (concluding that it was "reasonable" to infer that evidence of "marijuana cultivation" would be found in a closed "lunch box").

## B.  Motion to Suppress Statements

Defendant Ginyard also seeks to suppress all statements he made to law enforcement officers during the execution of the search warrant, contending that they were obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).   *See* Def.'s Mot. to Suppress Stmts. at 3 (seeking exclusion of "[t]he statements made by Mr. Ginyard to law enforcement on May 30, 2020[.]"); Def.'s Reply at 22 ("[E]verything that followed the initial question(s) by [HLEO] Matheson was in violation of the defendant's *Miranda* rights, and therefore must be suppressed."). The parties do not dispute that Defendant Ginyard was never given *Miranda* warnings during the execution of the Search Warrant.

To prevail on a motion to suppress statements obtained in violation of *Miranda*, the defendant must show that the statements resulted from "custodial interrogation."   *See Miranda*, 384 U.S. at 444; *United States v. Vinton*, 594 F.3d 14, 26–27 (D.C. Cir. 2010).   A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."   *Miranda*, 384 U.S. at 444.   For *Miranda* to apply, the defendant must be in custody and an interrogation must be taking place.   *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980); *Vinton*, 594 F.3d at 26.

32

During the motions hearing, the Government conceded that Defendant Ginyard was "in custody" when he was handcuffed and seated on the couch in his living room—which occurred before any law enforcement officers asked him any questions.  *See supra* Section I(B)(3); *see also, e.g.*, *United States v. Richardson*, 36 F. Supp. 3d 120, 129 (D.D.C. 2014) (defendant was "in custody" when "[a] number of armed officers had forcibly entered [her] apartment . . . with weapons showing, handcuffed her behind her back, and placed her in the living room while they executed the search warrant"); *United States v. Peterson*, 506 F. Supp. 2d 21, 24 (D.D.C. 2007) (defendant was "in custody" when handcuffed during execution of a search warrant, after "forced entry" by "several officers" with "unholstered weapons . . . clearly visible").

The remaining question, then, is which of Defendant Ginyard's statements were the result of "interrogation."   "'Interrogation' refers to express questioning and also to any words or actions on the part of the police that the police should know are reasonably likely to elicit incriminating answers."  *United States v. Williamson*, 181 F. Supp. 3d 41, 43 (D.D.C. 2014) (citing *Innis*, 446 U.S. at 300–01).   However, responses to question that "otherwise qualify as 'custodial interrogation' are rendered admissible when they fall within the 'routine booking question' exception."  *Id.* (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990)).   Moreover, "volunteered and spontaneous statements" made without *Miranda* warnings are admissible "if they were not made in response to police questioning."  *Id.* (citing *United States v. Samuels*, 938 F.2d 210, 214 (D.C. Cir. 1991); *United States v. Tuten*, 293 F. Supp. 2d 30, 33 (D.D.C. 2003)).   The Court assesses the parties' arguments first as to Defendant Ginyard's statements made in response to direct questions and second as to his unprompted remarks.

1.  **Statements in Response to WHS or MPD Officers' Questions**

Review of the BWC videos shows that WHS and MPD officers asked Defendant Ginyard various questions as they were executing the search of his apartment.   *See supra* Section I(B)(3).  The Government agreed during the motions hearing that it would not seek to introduce most of Defendant Ginyard's responses to these questions in its case-in-chief at trial.   However, the Government argues that two exchanges between law enforcement officers and Defendant Ginyard fall within an "administrative" exception to *Miranda*: (1) Defendant Ginyard's response to HLEO Matheson's question before the firearm was recovered about where he keeps "any documentation in relation[ ] to the animal,"[13]  Anderson BWC 15:56:34–15:56:49; and (2) Defendant Ginyard's response to an MPD officer clarifying (after the firearm was found), "did you say the documentation was in your closet?" to which Defendant Ginyard responded, "I never told you a closet in my room . . . But y'all go straight to the room in there and look for whatever y'all found," *id.* at 16:11:13–16:12:05.

The Supreme Court held in *Muniz* that "officers asking routine booking questions 'reasonably related to the police's administrative concerns' are not engaged in interrogation within *Miranda*'s meaning and therefore do not have to give *Miranda* warnings."   *United States v. Gaston*, 357 F.3d 77, 82 (D.C. Cir. 2004).   In *Gaston*, the D.C. Circuit concluded that questions about the defendant's address and "ownership interest" in the house subject to a search were related to "administrative concerns" because of the officer's obligation to give a copy of the warrant and a receipt of the property taken to the person from whose premises the property was taken.   *Id.* (citing Fed. R. Crim. P. 41(f)(3)(A)).   In *Peterson*, however, another court in this jurisdiction concluded that a police officer's question about "which bedroom was defendant's" did not fall

---

[13]  The Government agreed during the motions hearing that it would not seek to introduce this statement in its case-in-chief, but nonetheless argued that the "administrative exception" to *Miranda* applies.

within the exception for "identifying and biographical information" identified in *Muniz* and *Gaston*. 506 F. Supp. 2d at 24–25. The Court in *Peterson* noted that asking defendant to identify which bedroom belonged to him was not seeking "identifying [or] administrative information," but instead was more "plausibly construed as a question intended to determine whether [the] defendant could be connected to any evidence of a crime found in the apartment." *Id.* at 25. Here, the Government has not pointed to a specific "administrative concern" associated with asking Defendant Ginyard where documents about dog ownership or veterinary care were located. Rather, as with the question in *Peterson*, such questions were targeted at linking Defendant Ginyard to evidence of the animal cruelty offense underlying the Search Warrant. Accordingly, the "administrative concerns" exception to *Miranda* does not apply to these statements.

Because Defendant Ginyard was "in custody" and the police officers' questions were "interrogation," his responses were elicited in violation of *Miranda*. Accordingly, the Court **GRANTS IN PART** Defendant Ginyard's Motion to Suppress Statements to the extent his statements were in response to any WHS or MPD officer's questioning. If the Government seeks to introduce any responsive statements at trial to impeach Defendant Ginyard's testimony, the Court shall require the Government to notify the Court and defense counsel before doing so. *See Vega v. Tekoh*, 142 S. Ct. 2095, 2097 (2022) (citing *Harris v. New York*, 401 U.S. 222, 224–26 (1971)).

### 2.  Unprompted Statements

Because Defendant Ginyard asks the Court to suppress "all" statements (including those not in response to direct questions), the Court next assesses whether or not his unprompted statements must also be suppressed. *See* Def.'s Mot. to Suppress Stmts. at 3; Def.'s Reply at 22; Joint Notice at 3–4. Defendant Ginyard talked at length during the execution of the Search

Warrant, asking the police officers questions and expressing his opinion about the conduct of the search.   Most of these statements were unprompted and not in response to any question. However, he argues that "officers had to know that the conversations between the officers and the defendant were inclined to elicit incriminating information."   Def.'s Reply at 23.   But he does not point to any specific comments made by any law enforcement officer that would amount to "functional interrogation" designed to elicit incriminating information, as he claims.   *Id.*   Rather, based on its own review of the BWC videos provided in this matter, the Court has identified many statements "volunteered" by Defendant Ginyard "without prompting from the police."   *Samuels*, 938 F.2d at 214.   Such "spontaneous" statements are "admissible without *Miranda* warnings." *Id.*   Accordingly, based on the present record, the Court **DENIES IN PART** Defendant Ginyard's motion to suppress statements that were made without prompting.   However, if the Government seeks to introduce any such statements at trial, the Court shall require the Government to notify the Court and defense counsel before doing so.

### III.    CONCLUSION

For the above reasons, the Court **DENIES** Defendant's [54] Motion to Suppress Evidence and **GRANTS IN PART** and **DENIES IN PART** Defendant's [55] Motion to Suppress Statements.   An appropriate order accompanies this Memorandum Opinion.

**Date**: August 25, 2022                              _____/s/_____

                                                                **COLLEEN KOLLAR-KOTELLY**
                                                                United States District Judge